**FIRST NATIONAL BANK OF CICERO,**
**Plaintiff–Appellant,**

v.

**LEWCO SECURITIES CORP., et al.,**
**Defendants–Appellees.**

**No. 87–2162.**

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1988.

Decided Oct. 27, 1988.

Rehearings and Rehearing En Banc
Denied Jan. 12, 1989.

1408

Michael P. Mullen, Burke Griffin Chomicz & Wienke, P.C., Chicago, Ill., for plaintiff-appellant.

David L. Carden, Coffield Ungaretti Harris & Slavin, Chicago, Ill., for defendants-appellees.

Before CUDAHY, RIPPLE and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

The plaintiff, First National Bank of Cicero (the "Bank"), appeals from a summary judgment entered in favor of defendant Lewco Securities ("Lewco") and from a separate but related summary judgment entered in favor of defendants Thompson McKinnon Securities ("Thompson McKinnon") and Donaldson, Lufkin and Jenrette ("Donaldson"). The Bank also appeals from the denial of its motion to amend its original complaint. This is a factually complicated diversity case at the heart of which lies the question whether the Bank accepted certain collateral as a "bona fide purchaser" (a "BFP") and whether, as a result, its claim to the collateral is superior to that of the defendants. We affirm in part, and vacate and remand in part.

### I.

The Bank commenced this action in the hope of recovering certain bond and stock certificates (collectively, the "bonds") that it had accepted as collateral for more than $2,500,000 in loans. The bonds were later discovered by the Bank to have been stolen from the various defendants and were in turn confiscated by the FBI in the course of its investigation of the theft. Consequently, the Bank seeks recovery of the bonds and a judgment declaring the respective rights of all parties in the collateral.

Between February 25 and June 10, 1982, the Bank made a series of loans to M & P Cartage ("M & P") and its principals, Edward and Adele Bontkowski, and to David Bruun. The collateral pledged for these loans took the form either of bearer bonds or of other marketable securities, all of which later turned out to have been stolen from the defendants. The first in the series were two loans the Bank made to M & P on February 25, 1982, totaling $470,000. These loans were collateralized by $480,000 worth of bearer bonds issued by the Industrial Development Corporation of the Port of Corpus Christi (Texas), which, unbeknownst to the Bank, had been stolen from defendant Lewco.[1] Lewco had purchased 100 such bonds on February 9, 1982, and had made arrangements to receive them under the auspices of an independent transfer agent. Lewco, however, never received the bonds.

During the ensuing two days, February 10 and 11, Lewco took a number of steps to insure that the financial community, and especially its securities clearing houses, was alerted to the fact that the Corpus Christi bonds were missing and apparently in unauthorized channels. Lewco placed a "stop transfer order" against the bonds with their issuing institution, Corpus Christi National Bank. In addition, Lewco mailed a "Missing/Lost/Stolen Counter Securities Report" (Form X–17f–1A) to a national computer bank, the Securities Information Center (the "SIC"). The SIC is a central data base established by the Securities and Exchange Commission (the "SEC") to process reports and inquiries pertaining to lost or stolen securities. All banks whose deposits, like those of the Bank, are insured by the Federal Deposit Insurance Corporation are required to make inquiry of the SIC before accepting securities in excess of $10,000 as collateral for loans. *See* 17 C.F.R. § 240.17f–1 (1988).[2] Lewco's

---

1. In May 1982, the Bank lent M & P an additional $99,500 secured in part by the Corpus Christi bonds already pledged as collateral. Thus, the total sum extended to M & P secured by the Corpus Christi bonds amounted to $569,500.

2. Entitled *Required inquiries,* 17 C.F.R. § 240.17f–1(d)(i) states in relevant part:

   Every reporting institution [defined, *inter alia,* as banks whose deposits are insured by the Federal Deposit Insurance Corporation] ... *shall* inquire of the [Securities and Ex-

Corpus Christi bonds were entered on the SIC data base as stolen on February 23, 1982, two days *before* the bonds were pledged and accepted as collateral for the Bank's loans. It is undisputed that, despite its obligation to do so, the Bank never inquired of the SIC in order to verify M & P's title to the bonds.

Similarly, between March 11 and June 8, 1982, the Bank made a series of nine loans to David Bruun, totalling $2,148,000, of which $1,368,000 is still outstanding. These loans were secured by $495,000 in Intermountain Power Agency Power Supply revenue bonds, 1981 Series D, due 2018; $250,000 in Intermountain Power Agency Power Supply revenue bonds, 1981 Series D, due 2021; $1,000,000 in New Jersey Health Care Facilities Financing Authority revenue bonds, Series A, due 2010; and certain shares of listed common stocks. As with the Corpus Christi bonds pledged as collateral by M & P, not only were the bonds pledged by Bruun in bearer form and thus freely negotiable but they too had been stolen.

Defendant Donaldson claims an interest in the Intermountain Power Agency bonds, due 2018, while defendant Thompson McKinnon claims an interest in the Intermountain bonds, due 2021. Donaldson's report to the SIC concerning its $495,000 in missing Intermountain bonds appeared in the SIC data base March 19, 1982, *after* two loans totalling $415,000 had already been made to Bruun. Thompson McKinnon's report to the SIC, that it was missing $250,000 in Intermountain bonds, was entered into the SIC data base on March 31, 1982, *after* the Bank had lent Bruun an additional $300,000. The remaining collateral pledged by Bruun, consisting of $1,000,000 in stolen New Jersey Health Care Authority bonds, was used to secure more than $1,000,000 in further loans from

the Bank to Bruun between April 1 and June 8, 1982. None of these missing bonds was ever reported to the SIC. However, as with the M & P loans, the Bank once again failed to inquire of the SIC with respect to *any* of the collateral furnished by Bruun. In fact, not until June 10, 1982, did the Bank, through its president and chairman Joseph Scheussler, learn for the first time that all of the collateral involved in the Bruun and M & P Cartage loans had been obtained illegally by the respective borrowers.

William Giova, a senior vice-president of the Bank and senior loan officer, represented it in connection with both the Bruun and M & P loan transactions. Giova had thirty years of experience in the banking industry, including eleven years as the president of the Bank of Elmhurst, before he joined the Bank. As a senior vice-president and senior loan officer, Giova reported directly to Scheussler and was responsible for, among other things, authorizing loans and lines of credit in amounts up to but not exceeding $50,000; evaluating loan applications and making loan recommendations to Scheussler and the Board of Directors; and verifying the validity and value of collateral. But Giova was also an active participant in the illegal loan and collateral transactions. Together with Bruun, the Bontkowskis of M & P and a person named Ronald Berkowitz, Giova was indicted for various banking and securities offenses. Giova subsequently pleaded guilty to two counts of a multi-count indictment charging him with conspiracy to knowingly transport stolen securities in interstate commerce, as well as conspiracy to commit other offenses against the United States, in violation of 18 U.S.C. section 371 (1982), and with willful misapplication of bank funds, in violation of 18 U.S.C. section 656 (1982).[3]

change] Commission or its designee [the SIC data base] with respect to every security which comes into its possession or keeping, whether by pledge, transfer, or otherwise, to ascertain whether such security has been reported as missing, lost, counterfeit, or stolen
. . .
(emphasis added). Inquiry is not required by § 240.17f–1(d)(i) if any one of five separate con-

ditions is met. None of those conditions is met in the instant case. During 1982, the year of the transactions involved in this case, the SEC reported an average of 6,927 daily inquiries to the SIC. 15 Sec.Reg. and L.Rep. (BNA) No. 32, p. 1557 (1983).

**3.** *See, e.g., United States v. Bontkowski,* 850 F.2d 306 (7th Cir.1988); *United States v. Bruun,* 809

Proceedings in this case before the district court, culminating in the two separate summary judgments currently on appeal, resulted in three published decisions. In its first opinion, the district court denied the defendants' motions for summary judgment on the grounds that too many "key facts" remained in dispute. *First Nat'l Bank of Cicero v. United States*, 625 F.Supp. 926 (N.D.Ill.1986). Subsequently, upon further factual development, the court granted defendant Lewco's motion for summary judgment, concluding that because observance of "reasonable commercial practices" by the Bank should have included inquiry with the SIC and because such inquiry would have put the Bank on notice as to Lewco's adverse claim to the collateral, the Bank had constructive notice of Lewco's claim. Consequently, with respect to the missing collateral claimed by Lewco, the district court held that the Bank could not claim BFP status. *First Nat'l Bank of Cicero v. United States*, 653 F.Supp. 1312 (N.D.Ill.1987). The court, however, denied defendants Donaldson and Thompson McKinnon summary judgment because of their inability to demonstrate as a matter of uncontested fact and of law that the Bank also had constructive knowledge of their adverse claims to the collateral. *Id.*

Ultimately, in its third and final opinion, the district court reconsidered its earlier decision and granted the remaining defendants summary judgment. The court held, not without some difficulties of analysis, that, despite the fact that inquiry of the SIC would have furnished the Bank no notice of any adverse claims, the Bank could not prevail because of its failure to observe "reasonable commercial practices." In effect, failure to inquire of the SIC precluded the Bank from claiming that it had acted in good faith. *First Nat'l Bank of Cicero v. United States*, 664 F.Supp. 1169 (N.D.Ill.1987). The court then denied the Bank's last-minute motion to amend its original complaint. *Id.* The Bank, in turn, brought the present appeal.

## II.

Since the Bank is appealing from grants of summary judgment to the defendants, we must draw all inferences from the record in its favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988). However, the party bearing the burden of proof on an issue may not simply rest on its pleadings, but must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A non-moving party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356.

All parties agree that Article 8 of the Uniform Commercial Code ("UCC"), as adopted in Illinois, Ill.Rev.Stat. ch. 26, §§ 8–101 to 8–409, controls the central question whether the Bank can claim BFP status and thereby assert title to the bonds superior to the claim of the defendants. Article 8 of the Illinois UCC defines a BFP as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form...." Ill.Rev.Stat. ch. 26, § 8–302. The Bank has the burden of proving that it is a BFP. *Oscar Gruss & Son v. First State Bank of Eldorado*, 582 F.2d 424, 433 (7th Cir.1978); *Ehrlich v. Nyberg*, 78 Ill. App.3d 500, 509, 33 Ill.Dec. 549, 556, 396 N.E.2d 1273, 1280 (1st Dist.1979). Thus, in order to prevail against the defendants' motions for summary judgment, the Bank must have adduced specific, significantly probative facts that, as a matter of law,

would demonstrate that it had indeed accepted the bonds as collateral both without notice of any adverse claims and in good faith.

### A. *The M & P Loans*

■ In its decision granting Lewco summary judgment on the Bank's claim to the Corpus Christi bonds, the district court relied chiefly upon Illinois UCC section 8–318.[4] Judge Moran held that the Bank failed to demonstrate that it had acted in good faith because it neglected to observe, as section 8–318 requires, "reasonable commercial practices" (in this case, inquiry to the SIC data base). Adherence to those practices would have furnished it with timely notice of Lewco's adverse claim. Although we concur in the conclusion that the Bank should be charged with notice of Lewco's adverse claim, we cannot look to section 8–318 to reach such a result.[5]

Section 8–318 is simply not applicable to the Bank in the circumstances presented by this case. Our research reveals, and the defendants have failed to persuade us otherwise, that section 8–318 was enacted in an effort to protect those *agents* and *bailees* (presumably having in mind entities like brokers or transfer agents) who, as defendants, faced lawsuits initiated by securities owners charging the agent or bailee with conversion or wrongful transfer of the owner's securities. In such situations, section 8–318 was intended to insulate from liability entities or individuals who, as agents or bailees, had acted in good faith reliance (as demonstrated objectively by "observance of reasonable commercial standards") upon the instructions of a principal—regardless whether the principal had the authority to so instruct the agent. *See* U.C.C. § 8–318 comment (purpose of provision "[t]o negate the liability of agents, including brokers, and of bailees, for innocent conversion or participation in breach of fiduciary duty."). The Bank, which defendants and the district court seek to bind by section 8–318, acted as a pledgee-*purchaser* of the collateral pledged by M & P, not as a bailee or an agent in the role of traditional custodian or transfer agent of securities. *See* Ill.Rev.Stat. ch. 26, § 1–201(32) (" 'Purchase' includes taking by ... pledge ... or any other voluntary transaction creating an interest in property."); *see also Morgan Guaranty Trust Co. v. Third Nat'l Bank of Hampden Cty.,* 400 F.Supp. 383, 390 (D.Mass. 1975) (§ 8–318 "contemplates the protection of a mere good faith conduit"; therefore section not applicable to bank accepting securities as collateral), *aff'd,* 529 F.2d 1141 (1st Cir.1976). We are thus reluctant to extend section 8–318 to cover a typical collateral transaction. Even the district court conceded candidly that section 8–318 does not appear to cover the sort of scenario presented here.[6]

---

**4.** Section 8–318 of the Illinois UCC states:

**No Conversion by Good Faith Delivery**

An agent or bailee who in good faith (including observance of reasonable commercial standards if he is in the business of buying, selling or otherwise dealing with securities) has received certificated securities and sold, pledged, or delivered them or has sold or caused the transfer or pledge of uncertificated securities over which he had control according to the instructions of his principal, is not liable for conversion or for participation in breach of fiduciary duty although the principal had no right so to deal with the securities.

**5.** The district court's analysis under section 8–318 seems to blur the distinction between good faith and an absence of notice, each of which is an independent prerequisite of BFP status under section 8–302, and only one of which, good faith, is mentioned in section 8–318. As is outlined *infra,* section 8–318 sets out a standard of conduct which, if adhered to, entitles an agent

or bailee to a conclusive presumption that that individual or entity acted in good faith. The district court, however, imputed *notice* to the Bank based on its failure to observe "reasonable commercial practices" as mandated by section 8–318. While a failure to observe section 8–318's "reasonable commercial practices" standard (in situations where section 8–318 is properly applicable) can, by the statute's own terms, result in a finding of absence of good faith, nothing suggests that absence of section 8–318 good faith is equivalent to a finding of constructive notice.

**6.** In its final opinion in this case, *First Nat'l Bank of Cicero,* 664 F.Supp. at 1172, the district court remarked, "as we noted before ... the language of UCC § 8–318, Ill.Rev.Stat. ch. 26, ¶ 8–318, the statutory source for the objective standard for the good faith of those who regularly deal in securities, does not precisely fit this case...."

■ Rather than affirming Lewco's summary judgment on the grounds articulated by the district court, we find an alternative basis for affirmance—a finding that the Bank's failure to observe mandatory federal regulations results in its being charged with notice of Lewco's duly reported adverse claim. *See, e.g., Bennett v. Tucker,* 827 F.2d 63, 70 (7th Cir.1987) (where no material facts are in dispute, district court's grant of summary judgment may be affirmed on any alternative ground presented to the district court if, as a matter of law, appellee is entitled to prevail).

With respect to the M & P transaction, the Bank's undisputed failure to comply with federal regulations *requiring* verification of collateral, *see* 17 C.F.R. § 240.17f–1 (1988), removes its defenses against Lewco, whose adverse claim was reported to the SIC data base two days *before* the Bank accepted the Corpus Christi bonds and disbursed loan proceeds secured by the bonds. Under these circumstances, there is no need to apply section 8–318 in order to conclude that the Bank was not a BFP. Instead, section 8–302, which requires that a BFP take securities "without notice of any adverse claim," mandates a finding that the Bank had constructive notice that the Corpus Christi bonds were stolen. We reach this conclusion without regard to section 8–318, which, as discussed above, is inapplicable by its terms to the facts of the present case.

It must be stressed that section 8–302 imposes two independent requirements for a purchaser of securities to attain BFP status: the purchaser must take the securities in good faith, *and* without notice of adverse claims.[7] These two requirements must not be confused or conflated: while "good faith" is defined subjectively as "honesty in fact," section 1–201(19), "notice" is defined objectively, and includes circumstances in which a purchaser of securities has "reason to know" of adverse claims. § 1–201(25)(c).[8] *Oscar Gruss,* 582 F.2d at 431–32; *see also Merrill Lynch, Pierce, Fenner & Smith v. City Nat'l Bank of Detroit,* 628 F.2d 969, 970 (6th Cir.1980) (per curiam); *Morgan Guaranty Trust Co. v. Third Nat'l Bank of Hampden Cty.,* 529 F.2d 1141, 1144 (1st Cir. 1976); *Von Gohren v. Pacific Nat'l Bank of Washington,* 8 Wash.App. 245, 505 P.2d 467, 472 (1973) (while "good faith" does not incorporate a "reasonable care" standard, "notice" under the UCC encompasses all information available through adherence to reasonable commercial standards). Under sections 1–201(25) and 8–302, a purchaser of securities will be charged with notice of those adverse claims which were discoverable through adherence to reasonable commercial standards of business conduct. In the present case, compliance with federal

Moreover, the cases cited by the district court to support its application of section 8–318 to this case are factually distinguishable. As noted, *Morgan Guaranty Trust Co. v. Third Nat'l Bank of Hampden Cty.,* 400 F.Supp. 383 (D.Mass. 1975), *aff'd,* 529 F.2d 1141 (1st Cir.1976), held that section 8–318 did *not* apply to a bank which accepted securities as collateral for a loan. In *Insurance Co. of North America v. United States,* 561 F.Supp. 106, 113–14 (E.D.Pa.1983), the district court did apply section 8–318's reasonable commercial practices standard to the conduct of a plaintiff/putative BFP who was not the true owner of the securities at issue and who did not sue on the basis of the defendant's alleged conversion. However, the plaintiff/putative BFP whose conduct was measured against section 8–318 had acted as an *agent* in its dealings with the securities, not as a pledgee-purchaser as in the case at bar. Finally, *United States Fidelity & Guaranty Co. v. Royal Nat'l Bank,* 545 F.2d 1330 (2d Cir.1976), involved a bank which, acting as an *agent,* sold what turned out to be stolen

securities for its customer and was later sued for conversion by the victim's insurer.

7. A third requirement of section 8–302, that the purchaser take the securities "for value," is not in issue in this case, and is therefore omitted from the discussion in the text.

8. While in many cases the same set of facts might establish that a purchaser acted both with notice and in bad faith, drawing a sharp distinction between the two concepts is more than an exercise in semantics. The UCC provides in various circumstances that good faith or notice be determined without reference to the other requirement. For example, a good faith purchaser of goods may receive good title from one who possessed only voidable title; notice is irrelevant to this inquiry, except to the extent that actual notice of adverse claims might defeat a purchaser's claim of subjective good faith. § 2–403; *see In re Samuels & Co.,* 526 F.2d 1238, 1243–44 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

regulations *requiring* the verification of collateral is necessary to support a finding that a bank satisfied reasonable commercial standards. *See* Yadley & Ilkson, *Bona Fide Purchasers of Lost and Stolen Securities: Meeting the "Good Faith" and "Notice" Requirements*, 5 GMU L.Rev. 101, 129–30 (1982) (suggesting that failure to check SIC data base where regulations mandate inquiry should result in finding of constructive notice).[9]

Thus, quite apart from section 8–318's definition of "good faith," the Bank must be charged with constructive notice of all adverse claims which were reasonably discoverable through adherence to reasonable commercial standards. Had the Bank, in the person of Giova, followed federal regulations and attempted to verify the M & P collateral with the SIC, all parties acknowledge that the collateral would have appeared listed as missing. The Bank, however, never attempted to verify the collateral in this fashion. Having thus failed to comply with federal law, the Bank is hardly in a position to claim the advantageous status of a BFP without notice; moreover, such a result would severely undermine the federal government's efforts to stem the growing criminal trafficking in securities.[10]

The Bank vehemently resists the imposition upon it (and by extension all putative BFP's) of such a duty of inquiry, which, it claims, "effectively revise[s] BFP law with staggering implications on negotiability." Appellant's Brief at 39. As a fallback position, the Bank argues that even if its failure to inquire of the SIC results in an imputation of notice of Lewco's adverse claim, that notice is fairly attributable only to its agent, Giova. He alone was charged with directing the Bank's verification inquiries to the SIC. We do not agree with either of these arguments.

■ First, with respect to the Bank's charge that the duty to inquire of the SIC will irreparably impair the negotiability of securities (thereby impeding the flow of commerce), we simply disagree.[11] Congress was well aware that any mechanism designed to stop the trafficking in stolen securities might impose some burden on the banking industry. Indeed, in response to concerns voiced by the banking industry, Congress specifically ordered the SEC to "carefully weigh the benefits of mandating inquiry in any specific situation against the costs and effect on efficient business practices and take into consideration the need to avoid requirements which may affect the legal status of a bona fide purchaser in a manner which would unjustifiably disrupt the normal course of commercial transactions." H.R.Rep. No. 94–229, 94th Cong., 1st Sess. 104, *reprinted in* 1975 U.S.Code Cong. & Admin.News 179, 335. The regulations codified at 17 C.F.R. § 240.17f–1 *et seq.*, which include the five exceptions to

---

9. In its Brief, the Bank suggests that requiring inquiry of the SIC will set us on a "slippery slope," and will ultimately lead to the conclusion that purchasers must inquire of the issuers and prior owners of securities. The Bank's concerns are premature. It is unnecessary for resolution of this case to enumerate exhaustively the inquiries which a securities purchaser must make in order to satisfy reasonable commercial standards. Whatever the outer bounds of a purchaser's duty of inquiry, that obligation clearly comprehends those inquiries mandated by applicable law.

10. The SEC's most recent Annual Report estimates that during 1987 there were $12.8 billion in lost, stolen or counterfeit securities registered in the SIC data base, an increase of $2 billion over the comparable figure for 1986. SEC Ann. Rep. (1988).

11. Remarkably, the Bank asserts that in imposing a duty to inquire of the SIC we and the district court are engaging in judicial legisla-

tion. We can only direct the Bank once again to the mandatory language of section 240.17f–1(d), *supra* note 2, which *requires* reporting institutions to inquire of the SIC. By merely enforcing this lawfully promulgated SEC regulation we can hardly be accused of fashioning and imposing our own rules of commercial conduct on the Bank. In fact, in testimony before Congress, the Chairman of the Federal Deposit Insurance Corporation made plain his view that, given existing technology, banks that did not attempt to ascertain the validity of collateral where verification was required "would not appear to meet the requirement of a good faith [bona fide] purchaser." *Organized Crime, Securities: Thefts and Frauds: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Government Operations (Pt. 4)*, 93d Cong., 2d Sess. 565 (1974) (statement of Chairman Frank Wille).

the duty to inquire, represent an effort by the SEC to strike a balance between the effective suppression of securities theft and the unencumbered transfer and negotiation of securities.[12] A putative BFP is merely required to avail itself of information readily accessible and electronically retrievable in the SIC data base; the considerably more onerous task of initially completing and filing a "Missing/Lost/Stolen Counter Securities Report" remains with the victim of the theft. The banking business is more likely to grind to a halt from a flood of bogus securities than from the burden of requiring verification of pledged securities with the SIC data base. If the SEC program to reduce and eventually to eliminate criminal trafficking in stolen securities is to have any realistic chance of succeeding, the Bank's failure to comply with federal law by failing to verify M & P's collateral must result in attribution to the Bank of notice of Lewco's timely reported adverse claim to the Corpus Christi bonds.

█ The Bank's argument that notice is properly attributable only to Giova is similarly without merit. Federal regulations require banks which accept securities as collateral to verify *every* such pledged security with the SIC in order to ascertain whether it has been reported as missing, lost or stolen. *See* 17 C.F.R. § 240.17f-1(d)

(1988). Although the Bank's failure to consult the SIC may be attributable to Giova's misconduct, it is a familiar rule of agency law that a principal may not absolve itself of a duty of inquiry by pointing to its agent's failure to act with reasonable diligence and responsibility. *See* Restatement (Second) of Agency § 277, and Reporter's Note ("If the principal has a duty to others to acquire the information or that care be used to acquire it, he is responsible to the others for the consequences of the agent's failure to perform his duties to the principal."); *cf. Fleming v. United States*, 648 F.2d 1122, 1127 (7th Cir.1981) (taxpayer liable for failure to file timely return even though taxpayer's attorney negligently failed to file proper request for extension of time). In this case, the Bank had a nondelegable duty to verify the genuineness of the collateral with the SIC. It may not escape liability for its failure to comply with the regulations by reliance on the dishonesty of one of its own employees.[13]

The equities of the present case certainly support this conclusion. As required by federal regulations, Lewco immediately reported the theft of its securities to the SIC. *See* 17 C.F.R. § 240.17f-1(c)(i) (1988). The Bank, admittedly due to the default of a faithless employee, failed to fulfill its obligations under the SEC's regulations. This

---

**12.** Aside from mandatory inquiries, the SEC's regulations also permit institutions to make inquiries of the SIC data base in circumstances where no inquiry is required by law. In promulgating the permissive inquiry regulations, the SEC stressed that

> in allowing permissive inquiries, [the Commission] does not intend to incorporate an inquiry requirement into the bona fide purchaser doctrine each time a reporting institution receives a security certificate. The Commission recognizes that to require or to suggest inquiry in all cases would seriously jeopardize the ability of financial institutions to function in an efficient manner.

SEC Release No. 34-13832, 42 Fed.Reg. 41,022, 41,023-24 (1977) (announcing final adoption of lost and stolen securities reporting and inquiry requirements); *see also* SEC Release No. 34-13053, 41 Fed.Reg. 54,923, 54,924 (1976) (making identical observation in announcement of SIC pilot program). The SEC's refusal to alter traditional BFP law where inquiry of the SIC is permissive illustrates the agency's sensitivity to

the competing considerations involved in regulation of securities transactions. We honor the careful balance drawn by the SEC as the executive agency charged by Congress with primary responsibility for regulation of the securities market.

**13.** The "adverse agent" doctrine and its exceptions, *see infra* at 1417-18, are irrelevant to our conclusion that the Bank is to be charged with knowledge of Lewco's claim. We do not impute notice to the Bank based on Giova's actions or knowledge. The Bank was under a duty to inquire of the SIC; it failed to do so. The Bank's liability is established without reference to Giova's actions or state of mind. In contrast, with respect to the Bruun loans, Donaldson and Thompson McKinnon seek to impose liability on the Bank based *affirmatively* on Giova's knowledge and conduct. In this situation, the fairness rationale underlying the "adverse agent" doctrine is implicated: the Bank should not be liable due to its employee's misfeasance if he was acting adversely to the Bank's interests.

is thus not a situation where both parties are partially to blame for the Bank's acceptance of tainted collateral. Indeed, Lewco's compliance with the regulatory requirements enabled the Bank to discover quickly and easily for itself that an adverse claim had been filed against M & P's collateral. Under these circumstances, both logic and equity dictate a finding that the Bank must be charged with notice for its failure to abide by federal law, the purpose of which is to curb the sort of dishonest conduct evidenced in this case.

## B. *The Bruun Loans*

In contrast to Lewco's reporting of the theft of its bonds prior to the disbursement to M & P of any loan proceeds secured by the bonds, neither Thompson McKinnon nor Donaldson succeeded in registering the theft of their securities with the SIC before the Bank accepted those same securities as collateral for over $2,000,000 in loans to David Bruun.[14] Notwithstanding that initial inquiry of the SIC would not have furnished the Bank with notice of any adverse claim to the Bruun collateral, the district court turned again to the provisions of section 8–318 and held that the Bank's failure to inquire constituted a corresponding failure to observe "reasonable commercial practices." Hence, as a matter of law, a showing of good faith was precluded. We agree that the ultimate question is whether the Bank can show good faith throughout the Bruun transaction; but in exploring that question, we must once more part company with the district court's analysis.

■ We have concluded, for reasons previously indicated, that the "objective" standard of good faith set out in UCC section 8–318 is inapplicable in the circumstances of this case. Further, since compliance with SEC regulations would not have in-

formed the Bank that the collateral was stolen, no question of constructive notice arises with respect to the Bruun loans. We are, therefore, left to measure the Bank's conduct against the subjective standard of good faith found in the general definitions section of the UCC. Thus, section 1–201(19) defines "good faith" as simply "honesty in fact in the conduct or transaction concerned," a so-called "pure heart/empty head" standard. *Miriani v. Rodman & Renshaw, Inc.*, 358 F.Supp. 1011, 1013 (N.D.Ill.1973).

A careful review of the record persuades us that, other than through Giova, the Bank was completely honest in its dealings involving Bruun's stolen collateral. The defendants have not disputed that President Scheussler and, by extension, the Bank gained actual knowledge that some of the Bruun collateral had been stolen only as the result of an independent inquiry by a Bank director on June 10. The Bank then immediately notified the FBI and various regulatory agencies and later on the same day learned for the first time that *all* of the bonds used to secure the Bruun and M & P loans were the subject of adverse claims. Therefore, if the Bank's conduct is tainted by bad faith, it is only because of Giova's involvement in the Bruun transactions.[15] In order to gauge the effect of Giova's actions on the Bank's status as a BFP, two related questions must be answered: first, whether Giova acted in bad faith in accepting Bruun's collateral as genuine, and second, whether Giova's bad faith can be attributed to the Bank.

The Bank, for its part, asserts that Giova has never admitted to having knowledge that the collateral he accepted from Bruun was in any way tainted. Giova, according to the Bank, only pleaded guilty to one count of conspiracy to misapply bank funds

---

**14.** Federal regulations do not in so many words prescribe the precise time at which inquiry of the SIC is required. Obviously, if the regulatory scheme is to have even marginal impact, inquiry should be made at the time collateral is received and before any loan proceeds are released. Perhaps surprisingly, no inquiry is mandated prior to subsequent disbursements secured by previously authenticated collateral. We would note

that had such a requirement existed and been complied with, the Bank would have discovered after only its second disbursement to Bruun that much of his collateral had been stolen.

**15.** Of course, these observations are not intended as a limitation on what the District Court might determine on remand.

and to one count of actually misapplying such funds but in so doing he never intimated, let alone confessed to, knowledge that the collateral involved in the conspiracy was obtained through theft. The defendants, on the other hand, contend that, at the very least, Giova's claim that he was unaware of the collateral's origins strains credulity. As evidence, the defendants point to Giova's plea agreement in which they assert he pleaded guilty, *inter alia*, to knowingly transporting stolen securities in interstate commerce. Further, the defendants argue that it is inconceivable that Giova did not know that Ronald Berkowitz, his chief co-conspirator and the individual for whom Bruun and the Bontkowskis acted as strawmen, had obtained the collateral for their scheme through theft. Finally, the defendants assert that even if, as the Bank claims, Giova did not have actual knowledge that the collateral was stolen, he should have suspected foul play since the Bank had specifically decided not to extend any loans arranged or initiated by Ronald Berkowitz.

Putting the parties' conflicting assertions to one side, the following facts concerning Giova's involvement in the Bruun transaction are beyond dispute: 1) Giova willingly participated in, and was convicted of, conspiracy to defraud the Bank, and bank fraud; 2) the mastermind of this scheme was Ronald Berkowitz, a loan broker whose high risk loans Giova knew the Bank had decided to cease facilitating; 3) Giova referred Bruun to the Bank's loan committee knowing full well that Bruun was merely a "front" for Berkowitz; 4) Giova received kickbacks in exchange for introducing Berkowitz's strawmen to the Bank; 5) Giova was fully aware that the proceeds of the Bruun loans were to be used for purposes other than those represented to the Bank; 6) despite the fact that Giova's responsibilities included the verification of collateral, he never attempted to verify the collateral pledged in connection with Bruun's loans; and 7) Giova lied to the Bank by claiming to have checked the Bruun collateral when in fact he had performed no such check. These facts, when considered in conjunction, suggest that, whatever

words might be used to describe Giova's conduct, "honest" would not be among them. However, while certainly suggestive, the facts recited do not clearly resolve the crucial issue: did Giova know, or have reason to suspect from the circumstances of the transaction, that the Bruun collateral was stolen so that the bonds could not be accepted in good faith as collateral?

■ Even if Giova acted in bad faith in accepting Bruun's proffered collateral, the Bank strenuously asserts that the absence of good faith on the part of its agent cannot and should not be imputed to it. Any such imputation would of course make it impossible for the Bank to claim BFP status. The Bank relies upon the "adverse agent" exception to the general rule that a principal is charged with the knowledge of its agent acquired in the course of the principal's business. *See* Restatement (Second) of Agency § 274 (1958); *Curtis v. United States*, 262 U.S. 215, 222, 43 S.Ct. 570, 572, 67 L.Ed. 956 (1923). The adverse agent exception that the Bank seeks to invoke comes into play where the agent's interests are shown to be adverse to those of his principal. It is then presumed that such an agent is unlikely to fulfill his fiduciary duty of full disclosure to the principal. *See* Restatement § 282(1); *Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014, 1036 (N.D.Ill.1985); *McKey & Poague, Inc. v. Stackler*, 63 Ill. App.3d 142, 152, 20 Ill.Dec. 130, 137, 379 N.E.2d 1198, 1205 (1st Dist.1978).

■ If in fact Giova's conduct implicates this exception, then his lack of good faith cannot be imputed to the Bank and cannot frustrate the Bank's quest for BFP status. However, there is a second twist to the general rule of imputed notice—an exception to the exception. Where an adverse agent is also the *sole* representative of the principal in the transaction in question, the principal may once again be charged with the agent's knowledge. 3 W. Fletcher, *Corporations* § 827, at 153–62 (1975). This "sole actor" exception is founded on the notion that, where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal

must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability.

Surprisingly, there is little case law addressing the specifics of how participation in a transaction may render an agent a sole actor. Courts have found an agent to be a sole actor for his principal when "the whole procedure ... was entrusted by [the principal] to the initiation and execution of the agent...." *Curtis*, 262 U.S. at 222, 43 S.Ct. at 572. Alternatively, agents have also been held to be sole actors when they were "in complete control of [the principal's] affairs," *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir.1955), or when "there is not the slightest indication that any officer or employee of the bank except [the agent] exercised any independent choice or judgment." *Bosworth v. Maryland Casualty*, 74 F.2d 519, 521 (7th Cir.1935).

■ The precise scope of Giova's involvement in negotiating and approving the Bruun loans is perhaps the most hotly contested issue in this case. Of course, the burden to show that Giova was not a "sole actor" was squarely on the Bank. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552 (party opposing summary judgment must affirmatively demonstrate, by specific allegations, that there is a genuine issue requiring a trial for its resolution). In this connection, the Bank relies upon Giova's testimony in related criminal proceedings to the effect that, in addition to giving final approval to the Bruun loans, Scheussler also negotiated the interest rate. Based on this testimony, the Bank argues that Scheussler actively participated in the making of the Bruun loans, thus challenging the defendant's assertion that Giova was a sole actor.

However, Scheussler's own affidavit tends to belie the Bank's present claims. Scheussler states that his role in the Bruun loans was limited to giving the Bank's final approval to them, based exclusively upon Giova's representations concerning Bruun's solvency and the authenticity of his collateral. Scheussler thus suggests that his own participation in the making of the Bruun loans was perfunctory at best—essentially formal rather than substantive. Given Scheussler's contrary account of his own involvement in the Bruun transaction, it is difficult to credit Giova's testimony as an adequate basis for creating a *genuine* issue of fact as to Scheussler's actual responsibilities.[16]

Further, whatever Scheussler's participation in the loan transactions as a whole, we think the primary focus for present purposes should be on his role in the verification of collateral phase, viewed independently. Verification of collateral was a discrete task; there is no apparent reason why the Bank should escape liability if indeed it placed unqualified reliance on Giova for verification, even if there was some unrelated responsibility (the setting of interest rates, for example) that Scheussler may have retained.

The preceding discussion reveals that, although there may be indications of the drift of things, two factual issues crucial to the Bank's BFP status with regard to the Bruun collateral cannot be resolved adequately at this juncture: first, whether Giova, due to his knowledge of suspicious circumstances surrounding the transaction, acted in bad faith in accepting the Bruun collateral, and, second, whether Giova pos-

---

**16.** In *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987), we addressed at some length exactly what a party must demonstrate to show the existence of a genuine issue of fact precluding summary judgment. We said:

A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party. As the Supreme Court has stated, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." We must not weigh the evidence. Instead, we must see if the nonmovant's evidence is sufficient. In determining whether evidence is sufficient, we must of necessity consider the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at a trial on the merits. In addition, we draw all inferences in favor of the nonmovant. Such inferences, however, must be "justifiable".

(Citations and footnote omitted).

sessed such exclusive authority over the verification of the Bruun collateral that he was a "sole actor," whose knowledge should be imputed to the Bank despite the adversity of interests between agent and principal. Due to its reliance on section 8–318's objective standard of good faith, the district court did not find it necessary to address these issues. On appeal from a grant of summary judgment, it is of course not our role to resolve these apparent issues of fact. In addition, the record is incomplete, especially on the issue of Giova's honesty in fact in accepting the Bruun collateral. We therefore will vacate and remand to the district court for further proceedings designed to resolve the remaining material factual issues.[17]

### III.

■ The Bank has, in addition, appealed from the district court's denial of its motion seeking leave to amend its original complaint. As we have held repeatedly:

[A] motion [to amend] is always made to the sound discretion of the district court and the court may deny a leave to amend where the proposed amendment fails to allege facts which would support a valid theory of liability, ... or where the party to amend has not shown that the proposed amendment has substantial merit....

*Goulding v. Feinglass*, 811 F.2d 1099, 1103–04 (7th Cir.1987) (quoting *Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir.1979)). On appeal, we will reverse a denial of a motion for leave to amend only for abuse of discretion. *Id.*

The Bank sought to file its amended complaint nearly four years into the lawsuit, hoping to add common law tort claims sounding in negligence and seeking compensatory and punitive damages. According to the proposed complaint, the Bank maintained that the defendants were negligent in not promptly reporting the theft of their securities to the SIC. Had such reports been timely filed, the Bank alleged that the FBI, which had received independent information concerning the stolen bonds, would in all probability have intercepted the securities before they ever reached the Bank and occasioned the significant losses the Bank stands to sustain.

Putting to one side the separate question of what liability, if any, may be imposed upon a party bound to report stolen securities who fails to do so, we are skeptical of the Bank's implicit assertion that its acceptance of the disputed collateral is directly attributable to the defendant's failure to timely notify the SIC.[18] After all, it is undisputed that at no time did the Bank, through Giova, *ever* attempt to inquire of the SIC to learn if a claim against any of the securities had been filed. Having never checked with the SIC, the Bank is hardpressed to claim a right to rely on information it never sought to obtain. The Bank's other theory of negligence purports to impose liability on the defendants because their failure to file timely claims with the SIC prevented the FBI from getting an early start on the trail of the stolen bonds. Without questioning the FBI's resourcefulness, we cannot find that the district court abused its discretion by refusing to consider such an attenuated theory of causation. The Bank has failed to cite a single Illinois case supporting the notion that a claim of negligence might be maintained where, as here, the hypothetical intervening acts of a law enforcement agency are indispensable links in the chain of causation. The single case the Bank does cite to bolster its theory of negligence, *New Jersey Bank, N.A. v. Bradford Securities Operations, Inc.*, 690 F.2d 339 (3d Cir.1982), is distinguishable. In *New Jersey Bank*, the facts giving rise to the defendants' alleged negligence in-

**17.** Proceedings on remand need not necessarily take the form of a trial. Instead, upon renewed motions for summary judgment, the district court may conclude that the undisputed facts compel, as a matter of law, a finding that the Bank was guilty of bad faith in the Bruun transaction. Regardless of how the district court chooses to proceed, we would expect that the Bank may want to produce something more probative than the previously referred to excerpts of Giova's prior testimony which, if proffered at trial, would presumably be subject to objection as hearsay.

**18.** Of course, Lewco's adverse claim was filed with the SIC and appeared in the data base *prior* to the Bank's acceptance of M & P's collateral.

volved a situation where the bank claiming BFP status, unlike the Bank here, did make some attempt to verify the collateral. The collateral subsequently turned out to have been stolen, but the defendant had neglected to report the theft. Such a plausible causal relationship is quite lacking in the Bank's amended complaint. Hence, leave to amend was properly denied.

### IV.

In summary, we hold that the Bank was not a BFP as to defendant Lewco because the Bank had constructive notice of Lewco's adverse claim. We believe, further, that, based on a showing of evidence admissible at trial, the Bank may be unable to demonstrate good faith in the Bruun transactions and therefore may be ineligible for BFP status against defendants Thompson McKinnon and Donaldson. Nevertheless, on this point, we think the case must be remanded for a further determination by the district court based on the principles set forth in this opinion. We further conclude, however, that the district court did not abuse its discretion in refusing the Bank permission to amend its original complaint. Circuit Rule 36 shall not apply on remand.

AFFIRMED IN PART, VACATED AND REMANDED IN PART WITH INSTRUCTIONS.