Quordalis SANDERS, Plaintiff,

v.

Lt. Gregory HEITZKEY, Sgt. Stevens, Sgt. Delvaux, Officer Gilmet, Sgt. Cook and Officer Drenski, Defendants.

No. 90–C–331.

United States District Court, E.D. Wisconsin.

Feb. 27, 1991.

Quordalis Sanders, pro se.

Daniel Farwell, Asst. Atty. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

CURRAN, District Judge.

Quordalis Sanders, a prisoner in state custody, has brought the above-captioned action against six correctional officers (Lieutenant Gregory Heitzkey, Sergeant Gregory Stevens, Sergeant Kenneth Cook, Sergeant Michael Delvaux, Officer Christopher Gilmet, and Officer Dale Drenski) for violating his civil rights in connection with his conditions of confinement. He seeks declaratory relief as well as compensatory, nominal and punitive damages. *See* 42 U.S.C. § 1983. All the defendants are employees of the State of Wisconsin. At the time Sanders' claim arose all the defendants were employed at the Green Bay (Wisconsin) Correctional Institution. Sanders has not specified whether the defendants are being sued in their official or personal capacities, so, because of the nature of the relief sought, the court will assume that they are being sued in their personal capacities.[1]

The defendants answered and denied liability and, after the deadline for the completion of discovery had passed, they moved for summary judgment on the grounds that there are no issues of material fact in dispute and that they are entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56. This mo-

tion is now fully briefed and ready for decision.

## I. FACTS

Sanders' causes of action arose on February 14, 1991, when the defendants subjected him to a visual strip search as he was about to be confined in the Green Bay Correctional Institution segregation unit following a disciplinary hearing. In connection with their motion the defendants have set forth the facts that they consider undisputed and material. They are as follows:

"1. Plaintiff, Quordalis Sanders, is and at the times relevant to this action was incarcerated at the Green Bay Correctional Institution (GBCI).

"2. Defendant, Gregory Heitzkey, is and at the times relevant to this action was a Supervisor Officer I (Lieutenant) and his present position is Adjustment Program Supervisor.

"3. Defendant, Gregory Stevens, is and at the times relevant to this action was a Correctional Officer 3 (Sergeant) and his current posted position is Treatment Center Sergeant, Segregation Unit No. 1.

"4. Defendant, Michael Delvaux, at the times relevant to this action was a Correctional Officer 3 (Sergeant) and his posted position was treatment Center Sergeant for Segregation Unit No. 1.

"5. Defendant, Christopher Gilmet, at the times relevant to this action was a Correctional Officer 1. Defendant Gilmet is now a Correctional Officer 2 and his current posted position is Utility Officer.

"6. Defendant, Kenneth Cook, is and at the times relevant to this action was a Correctional Officer 3 (Sergeant) and his current posted position is Utility Sergeant.

"7. Defendant, Dale Drenski, is and at the times relevant to this action was a Correctional Officer 1 and his current posted position is Utility Officer.

---

**1.** The doctrine of sovereign immunity bars a suit for money damages against state employees in their official capacities. *See generally Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). And, in this case, the declaratory relief sought is merely a declaration that the plaintiff's rights were violated and that he is entitled to money damages.

"8. On February 14, 1990, inmate Sanders appeared for institution court before the Adjustment Committee with respect to Conduct Report #375202 charging him with violations of Wis. Admin. Code § DOC 303.15, Sexual Conduct, and Wis. Admin. Code § DOC 303.15, Sexual Conduct, and Wis. Admin. Code § DOC 303.25, Disrespect.

"9. On February 14, 1990, Lt. Heitzkey was a member of the Adjustment Committee which held the disciplinary hearing for inmate Sanders regarding Conduct Report #375202.

"10. On February 14, 1990, Sgt. Cook came into work at 1:00 p.m. for institution court. Sgt. Cook was the advocate for inmate Sanders at the Adjustment Committee hearing with respect to Conduct Report #375202.

"11. Inmate Sanders chose Sgt. Cook to be his staff advocate as indicated by his signature on the Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time, dated January 30, 1990.

"12. On February 14, 1990, Officer Gilmet worked his regular shift as Utility Officer and then at 1:00 p.m. he was assigned to assist with security for institution court.

"13. Officer Gilmet stood outside the door to the hearing room as the hearing took place.

"14. On February 14, 1990, Officer Drenski was assigned as court officer, assisting with security of inmates scheduled for institution court before the Adjustment Committee.

"15. On February 14, 1990, Sgt. Stevens was in charge of security in that it was his responsibility to make sure that the inmates were present for their hearing and shook down before they entered the hearing room, where the Adjustment Committee hears each case.

"16. On February 14, 1990, Sgt. Delvaux's position was Treatment Center Sergeant for Segregation Unit No. 1, assigned to the 2:00 p.m. to 10:00 p.m. shift. Sgt. Delvaux was the relief for Sgt. Stevens who worked the first shift.

"17. Inmate Sanders was found guilty of violating Wis. Admin. Code § DOC 303.-15, Sexual Conduct, and § DOC 303.25, Disrespect, and sentenced to three days adjustment segregation and sixty days program segregation.

"18. At the conclusion of the hearing, inmate Sanders walked out of the institution court room. Sgt. Cook left the institution court room and went to the Treatment Center Lobby. Sgt. Cook did not see inmate Sanders after he left the institution court room.

"19. Officer Drenski stood at the door to the hearing room when inmate Sanders walked out of the room. Inmate Sanders was then escorted to Segregation Unit No. 1 by Sgt. Stevens and other officers.

"20. Pursuant to Wis. Admin. Code § DOC 306.16(3)(b), "[b]efore an inmate enters or leaves the segregation unit or changes status within the segregation unit of a correctional institution," a strip search may be conducted. It is standard procedure at GBCI to conduct a strip search every time an inmate is transferred to adjustment segregation.

"21. Pursuant to Wis. Admin. Code § DOC 306.16(3)(b), Lt. Heitzkey ordered Sgt. Stevens to conduct a visual strip search of inmate Sanders before placing him in adjustment segregation.

"22. Lt. Heitzkey explained the visual strip search procedure to inmate Sanders. He explained to him that all inmates are required to submit to a visual strip search when changing status within the segregation unit.

"23. Sgt. Stevens then escorted inmate Sanders to a shake down room to perform a standard visual strip search. Inmate Sanders was ordered to remove all of his clothing and Sgt. Stevens placed his clothes in a locker which he then locked.

"24. It is Sgt. Stevens' standard practice to conduct a strip search as follows: He asks the inmate to hold his hands up in the air, checks under his armpits, behind his ears, in his ears, in his mouth, under his

tongue, and asks him to take out his dentures if he has any. He then checks the lower body by asking him to move his genitals back and forth, and then he asks him to turn around so he can check the bottom of his feet. Lastly, he asks him to bend over and spread his cheeks so that he can do a visual search of the rectum area. The inmate does all of the work. Sgt. Stevens does not touch any inmate in any manner during a routine visual strip search. He stands back and does a visual, giving oral commands.

"25. Inmate Sanders was fairly cooperative until he was ordered to bend over and spread his cheeks. At that time he became abusive and verbally threatened the other officers and Sgt. Stevens, saying, 'I'm getting out one day. I want you mother fucker peckerwoods to understand that and you won't have backup then.'

"26. Sgt. Stevens gave commands to inmate Sanders during the visual strip search. Inmate Sanders was talking to all of the officers the entire time, swearing at them and using other abusive language as the visual strip search was performed. His physical actions were cooperative until he was asked to bend over and spread his cheeks so that a visual rectum check could be made.

"27. Lt. Heitzkey, Officer Gilmet, Sgt. Delvaux and Sgt. Stevens then escorted inmate Sanders to a cell in Segregation Unit No. 1. Inmate Sanders walked into the cell in a cooperative manner. Lt. Heitzkey again ordered inmate Sanders to submit to a routine visual strip search. Inmate Sanders again refused.

"28. Lt. Heitzkey then ordered Sgt. Delvaux, Sgt. Stevens and Officer Gilmet to put on rubber gloves and the officers obtained rubber gloves from the control center and put them on.

"29. Lt. Heitzkey advised inmate Sanders that if he was not going to cooperate, the officers would have to spread his cheeks for him.

"30. Lt. Heitzkey gave inmate Sanders several direct orders to comply with the routine visual strip search before he made the decision to use assistance in this search.

"31. At this time inmate Sanders started to resist. His language became even more abusive and he made verbal threats to Sgt. Stevens.

"32. At this point Lt. Heitzkey ordered Sgt. Delvaux, Officer Gilmet, and Sgt. Stevens to enter the strip down cell.

"33. Sgt. Delvaux and Sgt. Stevens placed inmate Sanders' hands on the wall and held him slightly bent over. Lt. Heitzkey ordered Officer Gilmet to spread his butt cheeks, which he did with his forefingers. Lt. Heitzkey then said 'okay' and the officers let him go and left him in the cell and closed the door.

"34. Officer Gilmet did not stick any of his fingers into inmate Sanders' rectum area, nor did he see any other officer touch him in any manner in that area.

"35. Lt. Heitzkey did not have any physical contact with inmate Sanders.

"36. Lt. Heitzkey did not see any other officer stick his finger into the rectum of inmate Sanders.

"37. At that point, Officer Gilmet's regular shift was over and he left the institution.

"38. Sgt. Delvaux did not touch inmate Sanders anywhere in the buttocks area.

"39. Sgt. Delvaux did not observe any other officer stick his finger in the rectum of inmate Sanders.

"40. Sgt. Cook was not involved in the transfer of inmate Sanders and he did not escort him to Segregation.

"41. Sgt. Cook had no personal contact with inmate Sanders on February 14, 1990, nor did he physically touch him in any manner.

"42. Sgt. Cook was not present for the routine visual strip search which was conducted before placing inmate Sanders into adjustment segregation.

"43. Officer Drenski was not involved in the transfer of inmate Sanders and he did not escort him to Segregation.

"44. Sgt. Drenski heard inmate Sanders yelling at the officers after they had proceeded down the hall.

"45. Sgt. Drenski had no personal contact with inmate Sanders on February 14, 1990, nor did he physically touch him in any manner.

"46. Officer Drenski was not present for the routine visual strip search which was conducted before placing inmate Sanders into adjustment segregation.

"47. Officer Drenski remained at the institution court room continuing his duties as court officer, observing the next inmate's hearing.

"48. Sgt. Stevens then issued Conduct Report # 376236 to inmate Sanders on February 14, 1990, charging him with violations of Wis. Admin. Code § DOC 303.24, Disobeying Orders, § DOC 303.25, Disrespect, § DOC 303.28, Disruptive Conduct and § DOC 303.16, Threats.

"49. A disciplinary hearing was held on March 1, 1990, with respect to Conduct Report # 376236 and inmate Sanders was found guilty of each violation."

Defendants' Proposed Findings of Fact at 1–9 (citations omitted).

The court finds that the defendants' proposed facts are supported by the record as a whole. None of the proposed facts are challenged by Sanders in his response to the summary judgment motion. *See generally* Brief in Support of Motion Responses in Defendants' Motion for Summary Judgment. Therefore, the court will regard them as undisputed.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), parties moving for summary judgment must show that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

*McGraw-Edison Company v. Walt Disney Productions,* 787 F.2d 1163, 1167 (7th Cir. 1986). When faced with a properly supported motion for summary judgment, the nonmovant may not avoid judgment by simply resting on his pleadings. If the nonmovant bears the burden of production on an issue at trial, he must affirmatively demonstrate, by specific showings, that there is a genuine issue of material fact requiring a trial. *See First National Bank of Cicero v. Lewco Securities Corporation,* 860 F.2d 1407, 1411 (7th Cir.1988).

A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

A summary judgment procedure is not meant to be a trial on affidavits. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the summary judgment stage the judge's function is to determine whether there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See First National Bank of Arizona v. Cities Service Company,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). This inquiry implicates the substantive evidentiary standard of proof that would apply at a trial on the merits. Thus, in a civil case such as this, the record must show that a jury could find by a preponderance of the evidence that the party upon whom the burden of proof is imposed is entitled to a verdict in his favor. *See Anderson,* 477 U.S. at 252, 106

S.Ct. at 2512. If that party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Id.* at 249–50, 106 S.Ct. at 2510–11.

## III. DISCUSSION AND DECISION

### A. PERSONAL INVOLVEMENT

■ In moving for summary judgment, the defendants first contend that the plaintiff cannot establish that defendants Cook and Drenski participated in the strip search. Cook alleges that he had no contact with Sanders after the conclusion of the February 14, 1990, disciplinary hearing. *See* Affidavit of Kenneth J. Cook at ¶¶ 7–11. Drenski likewise alleges that he had no personal contact with Sanders after he left the hearing. *See* Affidavit of Dale A. Drenski at ¶¶ 7–11. Sanders has offered no evidence to refute these allegations. Therefore, because individuals cannot be personally liable for money damages under section 1983 without proof of personal involvement, *see Morales v. Cadena*, 825 F.2d 1095, 1101 (7th Cir.1987), the claims made against Cook and Drenski must be dismissed.

### B. QUALIFIED IMMUNITY

Next, the defendants contend that the strip search and attendant force used to compel Sanders to comply did not deprive Sanders of any constitutional right. Defendants Heitzkey, Stevens, Delvaux and Gilmet are entitled to qualified immunity from a suit for money damages if their conduct did not violate clearly established statutory or constitutional rights of which they should have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In analyzing a party's defense of qualified immunity, the court must conduct a two-part analysis by asking: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *See Wade v. Hegner*, 804 F.2d 67, 70 (7th Cir.1986).

In considering these questions in the context of a motion for summary judgment, the court is not limited to the allegations in the plaintiff's complaint, but may consider all the undisputed evidence in the record, read in the light most favorable to the nonmovant. *See Green v. Carlson*, 826 F.2d 647, 650 (7th Cir.1987). The court is to decide the issue of qualified immunity even when facts are in dispute. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988); *Rakovich v. Wade*, 850 F.2d 1180, 1201–02 (7th Cir.) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Once the issue of qualified immunity is properly injected into a case by a motion for summary judgment, the plaintiff bears the burden of demonstrating the existence of the alleged "clearly established" constitutional right. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cir.1988); *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987). To meet this burden the plaintiff must show the existence of a right sufficiently particularized to have put potential defendants on notice that their conduct probably was unlawful at the time of the alleged violation. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Conner v. Reinhard*, 847 F.2d 384, 388 (7th Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987). The Seventh Circuit has explained that closely analogous cases, decided before the defendants acted or failed to act, are often required to find that a constitutional or statutory right is clearly established. *See Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir.1986). *See also Conner*, 847 F.2d at 388.

■ When Sanders commenced this case he appeared to be claiming that his right to due process was violated because the defendants performed a body cavity search [2]

2. Section DOC 306(a)(c) of the Wisconsin Administrative Code provides that:
   A "body cavity search" is a strip search in which body cavities are inspected by the entry of an object or fingers into body cavities. These inspections shall be by medical staff.

in contravention of a Wisconsin regulation which requires that body cavity searches be performed by medical personnel. *See* Wis. Admin. Code § DOC 306.16(1)(c). At this stage of the proceedings, however, he appears to have conceded that only a visual strip search [3] was performed. There is no statutory, let alone constitutional, requirement that visual strip searches be conducted by medical personnel. The defendants explain that:

> In accordance with Department of Corrections policy and GBCI [Green Bay Correctional Institution] practice, inmates sentenced to adjustment segregation must undergo a strip search before they are transferred to the segregation unit. The strip search involves the removal of the inmate's clothes and a visual inspection of his body cavities. It may be conducted by any staff member. *See* Wis. Admin. Code §§ 306.16(1)(b), (2) and (3)(b).

Brief in Support of Defendants' Motion for Summary Judgment at 2. Therefore, Sanders' right to due process was not violated by the visual strip search procedure used by the nonmedical prison personnel.

■ Likewise, performing the strip search without probable cause to believe that Sanders was concealing contraband did not violate any established constitutional right of the plaintiff. Visual body cavity searches conducted as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court. *See Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir.1988).

■ Finally, Sanders makes the bare allegation that the defendants violated his Eighth Amendment rights by using excessive force to subdue him when they compelled him to submit to the strip search.

He claims that he sustained a head injury in the fracas and that he was denied medical treatment.

Defendants Heitzkey, Delvaux, Gilmet and Stevens admit that they used force against Sanders when he became abusive and disruptive during the search. However, they contend that the force used was not excessive under the circumstances. Whether state prison employees used excessive force against an inmate is a question of law for the court to decide. *See Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir.1990). In determining whether an Eighth Amendment violation has occurred, the court must consider:

> ... the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm.

*Davis v. Lane*, 814 F.2d 397, 400 (7th Cir. 1987) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied, sub nom. Employee–Officer, John, #1765 Badge Number v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

In this case the defendants needed to use force in order to complete the strip search required before Sanders could be transferred to the adjustment center. Sanders has presented no evidence that the defendants used more force than was needed to subdue him or that the head injury allegedly inflicted was serious or required medical care and the plaintiff has presented no evidence that the defendants acted maliciously or sadistically for the purpose of causing him harm. Because Sanders has proffered only bare allegations in support of his claims that the defendants used excessive force and denied him medical care, these issues need not be tried. *See Imperial Tobacco v. Philip Morris, Inc.*, 899 F.2d

---

**3.** Section DOC 306(1)(b) of the Wisconsin Administrative Code provides that:

A "strip search" is a search in which the inmate is required to remove all clothes. Permissible inspection includes examination of the inmate's clothing and body and visual inspection of body cavities. A strip search may only be conducted in a clean and private place. Visual inspection of body cavities may be by any staff. Except in emergencies, a strip search shall be conducted by a person of the same sex as the inmate being searched.

1575, 1581 (Fed.Cir.1990) (opponent of summary judgment motion must proffer more than conclusory testimony, affidavits or pleadings). *See also Tucker v. Quinlan,* 748 F.Supp. 32, 33 (D.D.C.1990) (inmate's personal opinion that he needed medical care insufficient basis to deny motion to dismiss). Sanders has failed to meet his burden of showing that the defendants violated any of his clearly established constitutional rights when they subdued him and strip searched him. Consequently, the court will grant summary judgment in favor of defendants Heitzkey, Stevens, Delvaux, and Gilmet because they are immune from Sanders' suit for money damages.

### ORDER

Having found that no material facts are in dispute and having concluded that the defendants are entitled to judgment as a matter of law, the court ORDERS that the Defendants' Motion for Summary Judgment (filed October 15, 1990) IS GRANTED. *See* Federal Rule of Civil Procedure 56.

IT IS FURTHER ORDERED that this action is dismissed with prejudice.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter a final judgment as a separate document. This judgment shall provide that:

This action came on for hearing before the Court, Honorable Thomas J. Curran, District Judge, presiding, and the issues having been duly heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED

that plaintiff Quordalis Sanders take nothing and that this action is dismissed upon its merits.

Done and Ordered.