139 F.3d 901
 12 NDLR P 104
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Ricardo HUNTER, Plaintiff-Appellant,
v.
HABEGGER CORPORATION, Defendant-Appellee.
 No. 97-2133.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 8, 1998.
Decided Mar. 5, 1998.
 
 Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. No. 96 C 241 William C. Lee, Chief Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. JOHN L. COFFEY, Hon. KENNETH F. RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Plaintiff Ricardo Hunter filed this complaint alleging that Habegger Corporation terminated his services as a temporary employee and did not hire him as a permanent employee because he is black and has had one leg amputated below the knee and because he brought charges regarding his employment to the Equal Employment Opportunity Commission ("EEOC"). Plaintiff also alleged that Habegger violated the Americans With Disabilities Act when it inquired about his workers' compensation history when he was applying for permanent employment.
 
 
 2
 In response, Habegger filed a motion for summary judgment together with affidavits. Hunter moved to strike portions of the affidavits submitted by Habegger in support of its summary judgment motion. This caused Habegger to file additional affidavits. Thereafter the district court denied the motion to strike. In April 1997 the district court filed a memorandum of decision and order granting Habegger's motion for summary judgment and denying plaintiff's motion to strike. We agree with Judge Lee's reasoning and have attached hereto his Memorandum of Decision and Order for fuller background.
 
 FACTS
 
 3
 Plaintiff is a black truckdriver with one foot amputated below the knee. Defendant Habegger is a wholesale distributor of heating and cooling equipment with its business in Cincinnati, Ohio. In 1994 it purchased Hedback Distributing Company of Fort Wayne, Indiana, and two additional wholesalers. One of Hedback's temporary employees was the plaintiff who was a delivery truck driver. When Hedback was purchased by defendant, three Hedback employees drove company-owned vehicles, namely, plaintiff and two salespeople. Plaintiff continued as a temporary employee while the salespeople became regular employees of defendant.
 
 
 4
 Habegger obtained its insurance through the Morgan Hoffman Insurance Agency of Cincinnati. The relevant coverage was issued by Indiana Insurance Company, which required that a driving record check be run on each new employee driving a company-owned vehicle. Habegger gave Morgan Hoffman the names of the two salespeople in order for a driver record search to be made, but plaintiff's name was not forwarded to Morgan Hoffman at that time.
 
 
 5
 On October 11, 1995, plaintiff was driving a Habegger vehicle and was involved in an accident. Within two weeks Habegger informed Morgan Hoffman, and the latter requested that a driving record search be run on the plaintiff.
 
 
 6
 When defendant began expanding, District Security and Investigation ("DSI") contacted Daniel Veit, Habegger's Human Resources manager, and it was decided that DSI should conduct background checks on prospective employees. In September 1995 plaintiff authorized DSI to receive information about his history, specifically his previous employment, his criminal history, his workers' compensation history and his driving record. DSI thereafter faxed plaintiff's vehicle driving record to Indiana Insurance Company, which revealed more than two driving violations of plaintiff. Indiana Insurance Company then informed Morgan Hoffman that it would not insure plaintiff if he were to drive a Habegger vehicle. Veit then instructed Habegger's Fort Wayne office not to permit Hunter to drive a Habegger vehicle. Because its insurance carrier would not cover plaintiff, Habegger terminated plaintiff on November 14, 1995.
 
 
 7
 In August 1996, plaintiff filed this complaint against Habegger. He complains that defendant refused to offer him fulltime employment because of his race and disability rather than on the ground that his driving record made him uninsurable. The complaint alleges that defendant deprived him of his civil rights under 42 U.S.C. § 91 and violated the Equal Employment Opportunities Act (42 U.S.C. §§ 2000e-2(m) and 2000e-3(a)), and the Americans With Disabilities Act (42 U.S.C. § 12101). Plaintiff requested compensatory and punitive damages, back pay, front pay, costs and attorney fees. However, in his memorandum of decision and order, Judge Lee decided that plaintiff's uninsurability was "a legitimate nondiscriminatory reason for his being let go" and therefore granted summary judgment for Habegger.
 
 
 8
 As Habegger has pointed out, plaintiff was not acceptable to be a truckdriver after it learned that he was not eligible for coverage under its auto liability insurance. While plaintiff asserts that Scott Turner, Habegger's Fort Wayne operations manager, allegedly made racist remarks, there has been no showing that he was involved in defendant's decision not to retain plaintiff. Instead, Daniel Veit was the decisionmaker with regard to whether to terminate plaintiff. As the district court held, Habegger did not continue plaintiff's employment because its insurer would not provide coverage for plaintiff, thus warranting summary judgment for Habegger. Hunter has been unable to show that he was terminated for any other reason. Furthermore, Habegger's reason for not continuing the employment of Hunter was not shown to be a pretext for discrimination or to violate any federal law.
 
 
 9
 Additionally, plaintiff's claim that Habegger violated the Americans With Disabilities Act when it inquired into his workers' compensation history when he was applying for permanent employment does not entitle him to relief. While the EEOC advises that "an employer may not inquire into an applicant's workers' compensation history before making a conditional offer of employment" (EEOC TECHNICAL ASSISTANCE MANUAL § 9.1), plaintiff would have to show more than a wrongful inquiry to prevail on anything other than a request for an injunction.[1] Plaintiff would have to demonstrate that but for the wrongful inquiry plaintiff would have been either retained or hired as an employee. Plaintiff is unable to show this here because he was terminated due to his uninsurability and not as a result of anything relating to the inquiry into his workers' compensation history. Therefore summary judgment in favor of Habegger was appropriate.
 
 
 10
 Judgment affirmed.
 
 MEMORANDUM OF DECISION AND ORDER
 
 11
 This matter is before the Court on a Motion for Summary Judgment filed by the defendant Habegger Corporation on January 27, 1997. Plaintiff responded to that motion on February 25, 1997 to which defendant replied on March 11, 1997. Also before the Court is a Motion to Strike filed by the plaintiff on February 25, 1997. Defendant responded to that motion on March 11, 1997 to which plaintiff replied on March 17, 1997. For the following reasons, the motion for summary judgment will be granted. The motion to strike will be denied.
 
 Factual background
 
 12
 Plaintiff, Ricardo Hunter, is black and has had one foot amputated below the knee. His occupation is that of a truck driver. Defendant Habegger is in the business of wholesale distribution of heating and cooling equipment.
 
 
 13
 For some time, the sole business location of Habegger was in Cincinnati, Ohio. That was to change and in 1994 it made several purchases of existing heating and cooling wholesalers in Indiana and Kentucky including Hedback Distributing Company in Fort Wayne.[1] At the time of its acquisition, Hedback had six regular and two temporary employees.[2] One of the temporary employees was the plaintiff who worked as a delivery truck driver.
 
 
 14
 When Hedback was purchased, three of its personnel drove company-owned vehicles--two salespeople and plaintiff. They would continue on in their positions, the salespeople as regular employees, and plaintiff as a temporary employee.
 
 
 15
 For quite some time, Habegger had obtained its business and commercial umbrella insurance company through the Morgan Hoffman Insurance Agency of Cincinnati. Primary business auto coverage and umbrella coverage was issued by Indiana Insurance Company. That company required that a motor vehicle driving record check be run on each new employee who would be driving a company-owned vehicle and on each employee transferring into a position which would cause them to drive such a vehicle.
 
 
 16
 Upon Habegger's purchase of Hedback, Morgan Hoffman was given the names of the two salespeople in order that a driver record search could be made. For some reason, plaintiff's name was not forwarded at that time.
 
 
 17
 On October 11, 1995, plaintiff was involved in an accident while driving a Habegger vehicle. Within two weeks of that accident, Habegger informed Morgan Hoffman about the accident and, shortly thereafter, a discussion was had about which insurance company would provide coverage when a temporary employee was involved in an accident in a Habegger-owned vehicle. Morgan Hoffman requested that a driving record search be run on the driver.
 
 
 18
 While these discussions were going on, Daniel Veit, the Human Resources Manager of Habegger got wind that an inquiry was being made about a temporary employee in Fort Wayne for whom no driving check had been made. Veit had recently received a copy of plaintiff's record from District Security and Investigation (DSI). DSI had contacted Veit after Habegger began expanding its business about conducting background checks on prospective employees. Because Habegger was expanding heavily at that period, it was decided that DSI would be given that opportunity.
 
 
 19
 As things would have it, the first person to be run through DSI was plaintiff who had submitted an employment application (to switch to regular employment) in September 1995.[3] On forms supplied by DSI and signed by plaintiff, DSI was authorized to receive information concerning Hunter's previous employment, his criminal history, his worker's compensation history and his driving record. The form was facsimilied to DSI on October 2, 1995.
 
 
 20
 On November 13, 1995, Morgan Hoffman was faxed the motor vehicle driving record of plaintiff. It in turn faxed the record to Indiana Insurance. That record revealed more than two violations. Upon review by Indiana Insurance, Morgan Hoffman was informed the next day that Indiana Insurance would not insure plaintiff were he to drive a Habegger vehicle. Veit then contacted Habeggers in Fort Wayne and told the people there that Hunter was not to drive a Habegger vehicle. He then called Interim Personnel and advised it that because Habegger's insurance carrier would not insure plaintiff, his services were no longer needed. Interim Personnel in turn contacted plaintiff to tell him he was terminated.[4]
 
 
 21
 While plaintiff was the first person for whom a DSI investigation was run, he was not the last. In fact, his replacement, James Painter, was subject to the same background investigation. Other employees have likewise since been subject to the same DSI pre-employment background profile investigation when seeking employment with Habegger.
 
 
 22
 Plaintiff asserts that there has never been a problem in his becoming insured either before or after his termination. In fact, he has been employed as a truck driver since his termination "with no insurability problems." Plaintiff also asserts that he "heard on a weekly basis, the Fort Wayne operations manager, Scott Turner, make racist comments."
 
 Application of Law
 
 23
 Based upon the foregoing facts, plaintiff filed suit in this Court under a number of theories. He alleges that he was subject to race discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e); that he was subject to disability discrimination in violation of the Americans with Disabilities Act (42 U.S.C. § 12117); that he was retaliated against for filing a charge with the Equal Employment Opportunities Commission; and that defendant's actions deprived him of his civil rights under 42 U.S.C.1981. After a review of the standards governing summary judgment and plaintiff's motion to strike, plaintiff's substantive claims will be considered.
 
 A. Summary Judgment Standards
 
 24
 Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 2512; In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir.1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir.1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir.1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).
 
 
 25
 Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir.1988); Guenin v. Sendra Corp., 700 F.Supp. 973, 974 (N.D.Ind.1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).
 
 
 26
 So that the district court may readily determine whether there are genuine issues of material fact, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends there is no genuine issue. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record all material facts to which the non-movant contends there are exists a genuine issue necessary to be litigated. See Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir.1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-51, 106 S.Ct. at 2511.
 
 
 27
 Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S.Ct. at 2512.
 
 B. Motion to Strike
 
 28
 Plaintiff has moved to strike certain portions of affidavits which defendant has filed in support of its motion for summary judgment. That motion relates to paragraphs five through nine of the affidavit of Ruth Turner and paragraphs six, seven, fifteen, seventeen and nineteen of the affidavit of Daniel O. Veit. Prior to considering the objections to those paragraphs, a preliminary matter needs to be addressed because it has some impact on this Court's ruling on the motion to strike.
 
 
 29
 Subsequent to the filing of the motion to strike, and as part of the response thereto, defendant filed the affidavit of Beverly S. Walker which cures some of the deficiencies in the original filings about which plaintiff complains. Plaintiff contends that this Court should not consider that affidavit because it was filed too late.
 
 
 30
 It is true that both the local rules and the Federal Rules of Civil Procedure contemplate that evidence in support of a motion for summary judgment will be filed contemporaneously therewith. Nevertheless, this Court will consider Walker's belated affidavit for any of a number of reasons. First, the affidavit does not substantively change the evidence before the Court. The new affidavit basically supports that what Turner has testified too regarding what she was told by Walker. It is basically cumulative. Second, plaintiff has not been prejudiced by the filing. Plaintiff has had an opportunity to respond and has in fact responded by arguing that the affidavit should not be considered. Third, as will be seen infra, the evidence before the Court is clear that defendant is entitled to summary judgment and as such "[i]t [would be] a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir.1983), merely because the Walker affidavit was filed late.
 
 
 31
 Turning to the specific objections in the motion to strike, plaintiff first objects to paragraph 5 of the Turner exhibit to the extent that it reference an attached three-page exhibit. Plaintiff's objection on this score is that there is no indication as to who prepared this exhibit and hence there is an inadequate foundation for its admission. However, it is undisputed that Turner's signature appears at the bottom of page one of the exhibit. Moreover, Turner avers that "copies of the transmittals I made to Ms. Sechrest on that date are attached as exhibit 1 hereto." (Turner Aff. p 5). Hence, Turner has an adequate foundation from which to identify the document.
 
 
 32
 Plaintiff next objects to paragraph 6 of the Turner affidavit. In that paragraph, Turner avers:
 
 
 33
 On October 24, 1995, Beverly Walker called me to provide preliminary information on a vehicular accident involving a Habegger vehicle in Fort Wayne. I took notes of the first notice on the agency's usual accident report form, a copy of which notes are attached hereto as Exhibit 2.
 
 
 34
 (Turner Aff. p 6). Leaving aside the fact that an affidavit has since been submitted by Walker, paragraph 6 of the affidavit does not in and of itself relate to any statement made by Beverly Walker and therefore does not constitute hearsay. To the extent that paragraph 6 references exhibit 2 and hence contains statements of Walker, it would appear that exhibit 2 is a business record within the meaning of Rule 803(6) of the Federal Rules of Evidence and hence is not hearsay.
 
 
 35
 Plaintiff next contends that paragraph 7 of the Turner affidavit should be stricken again on the grounds that it allegedly contains hearsay from Walker. Paragraph 7 does not contain any statement provided by Walker and the referenced exhibit 3 are merely notes of Turner's conversation with Walker.
 
 
 36
 Paragraphs 8 and 9 of the Turner affidavit to which plaintiff objects read:
 
 
 37
 8. On November 13, 1995, Ms. Walker faxed three pages of the motor vehicle driving record service report relating to Ricardo Hunter. The facsimile transmission which was sent to me on that date is attached as Exhibit 4 to my Affidavit. Since the report showed more than two minor violations I immediately faxed the information to Mara Sechrest. Ms. Sechrest called me less than 10 minute later and said "no way", meaning that the insurer would in no way insure any vehicle while driven by Mr. Hunter. I asked her to fax me the insurer's decision in writing.
 
 
 38
 9. On November 14, 1995, a facsimile transmission from Marta Sechrest came through overnight in response to my request that Ricardo Hunter be added as an insured driver. Ms. Sechrest advised that Hunter would be excluded from coverage. A copy of Ms. Sechrest's communication to me is attached as Exhibit 5. I notified Ms. Walker by facsimile transmission on the morning of November 14, 1995 that there was no coverage under commercial umbrella liability coverage, if Ricardo Hunter were to drive any vehicle for Habegger. My facsimile transmission to Bev Walker of November 14, 1995, which included Ms. Sechrest's communication to me of earlier that same date, is attached as Exhibit 6 to my affidavit.
 
 
 39
 (Turner Aff. pp 8 & 9). Insofar as there is any problem with the foundation for exhibit 4 (the facsimile from Walker to Turner) as set forth in paragraph 8 of the Turner affidavit, that problem has been rectified by the submission of Walker's affidavit. As for the conversations between Sechrest and Turner, this Court does not read defendant's argument to be relying on Sechrest's statements for the truth of the matter asserted. Rather they appear to be offered to show their effect on Walker's state of mind. Insofar as the statement are not being used to prove as a fact that Indiana Insurance would not provide insurance coverage for Hunter but instead are used to establish the basis for the belief that Indiana Insurance would not insure Hunter, the statement are not hearsay. "An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay. United States v. Hanson, 994 F.2d 403, 406 (7th Cir.1993)(citing United States v.. Harris, 942 F.2d 1125, 1130 (7th Cir.1991).
 
 
 40
 With respect to the affidavit from Veit, plaintiff first objects to paragraph 6 which reads:
 
 
 41
 For several years prior to December 31, 1994, it has been a requirement of the Indiana Insurance Company that a motor vehicle driving record check be run on each new Habegger employee whose job duties involve driving vehicles owned by Habegger, as well as for each existing employee transferring from a non-driving job within the company to a driving job. This requirement was in force at the time Habegger acquired Hedback.
 
 
 42
 (Veit Aff. p 6). Plaintiff asserts that to be admissible, an affidavit would have to be submitted from someone at Indiana Insurance. Paragraph 6 of Veit's affidavit, however, does contain any statement by any declarant who is an employee of Indiana Insurance but instead simply relates a belief of Veit garnered as a result of Habegger's long-standing relationship with Indiana Insurance with regard to Habegger's employees.
 
 
 43
 Plaintiff next objects on hearsay grounds to paragraph 7 because it refers to Walker failing to process the plaintiff's name when the driving records of the new Fort Wayne operation were researched. There is nothing, however, in that paragraph which contains a statement which was made by Walker and in any event, any deficiencies are remedied by the submission of Walker's affidavit.
 
 
 44
 Paragraph 15 of Veit's affidavit to which plaintiff objects reads:
 
 
 45
 On October 16, 1995, DSI faxed me information concerning its investigation of Mr. Hunter, including Mr. Hunter's driving record report from the State of Indiana. The information sent to me by DSI consisted of eight pages, including the facsimile cover page, and is attached as Exhibit 2 to my affidavit.
 
 
 46
 (Veit Aff. p 15). Plaintiff's objection to this paragraph is that it makes reference to the report received from DSI. It would appear that this too is a business record of Habegger, received in the course of its business, and Veit may authenticate a document contained in his records and received as part of his business duties.
 
 
 47
 Plaintiff next objects to paragraph 17 of Veit's affidavit on the grounds that it contains inadmissible hearsay. That paragraph reads:
 
 
 48
 On November 15, 1995, Ms. Walker advised me that our insurer, The Indiana Insurance Company, had advised Habegger through the Morgan Hoffman Insurance Agency that there would be no coverage whatsoever, either under the company's primary business auto coverage or its commercial umbrella liability coverage, if Ricardo Hunter were to drive any of the company's vehicles. I immediately contacted the Fort Wayne branch and advised personnel there not to permit Mr. Hunter to drive any Habegger vehicle. I then called Interim Personnel and advised that because our insurance carrier would not insure Mr. Hunter his services were no longer needed. Mr. Hunter was then called by Interim Personnel and terminated in a telephone conference while Mr. Hunter was at Habegger's Fort Wayne office.
 
 
 49
 (Veit Aff. p 17). To the extent that plaintiff is objecting to what Walker said, any perceived problem has been rectified by the receipt of Walker's affidavit. To the extent that plaintiff is objecting to the suggestion that Indiana Insurance would not insure plaintiff given his driving record, that again appears not to be submitted for its truth but rather is submitted to show Habegger's belief that Indiana Insurance would not provide coverage and hence it is not hearsay.
 
 
 50
 Finally, plaintiff objects to paragraph 19 of the Veit affidavit which reads:
 
 
 51
 Ricardo Hunter was not qualified to be a truck driver for Habegger because his driving record precluded his being covered under existing business automobile and commercial umbrella liability coverage.
 
 
 52
 (Veit Aff. p 19). Plaintiff objects to this paragraph on the grounds that "[i]n essence the insurance policy is testifying." Contrary to plaintiff's suggestion, the foregoing passage makes no reference to the contents of Habegger's insurance policy but rather appears to be an assertion about what Habegger believed regarding plaintiff's potential for coverage under its policies.
 
 C. Title VII, Section 1981, and ADA Claims
 
 53
 As indicated, plaintiff claims that he was discriminated against on the basis of race in violation of Title VII. He also claims discrimination on the basis of race in violation of section 1981. And he claims discrimination in violation of the Americans with Disabilities Act.
 
 
 54
 So far as relevant, Title VII makes it "an unlawful employment practice for an employer...to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons...shall have the same right...to make and enforce contracts,...as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a).
 
 
 55
 "Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." Johnson v. City of Fort Wayne, 91 F.3d 922, 940 (7th Cir.1996)(citing, Zuckerstein v. Argonne Nat'l Laboratory, 984 F.2d 1467, 1472 (7th Cir.), cert. denied, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993)). Similarly, where a plaintiff's complaint is that a defendant has discriminated against him "because of a disability," such a claims is one of disparate treatment and hence may be analyzed using the methods of proof and elements of a Title VII case. DeLuca v. Winer, 53 F.3d 793, 797 (7th Cir.1995).[5]
 
 
 56
 "In this type of discrimination case, where the disparate treatment of a single employee is at issue, a plaintiff can produce direct or indirect evidence of discrimination," Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir.1994), with the latter "involv[ing] the burden shifting approach established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.E.2d 668 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S .Ct. 1089, 68 L.Ed.2d 208(1981)." Id. In the present matter, after suggesting that he is relying on the burden shifting approach as set forth in McDonnell Douglas, plaintiff makes several arguments which are more in the form of direct evidence of discrimination and accordingly, this Court will discuss both methods of proving discrimination.
 
 
 57
 "Using the direct method to establish intentional discrimination, commonly referred to as disparate treatment, a plaintiff may introduce direct evidence or circumstantial evidence." Kormoczy v. Secretary Dept. of Housing & Urban Develop ., 53 F.3d 821, 824 (7th Cir.1995). "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent" while circumstantial evidence likewise can "provide a basis for drawing an inference of discrimination." Id .
 
 
 58
 There are three types of circumstantial evidence of intentional discrimination with the "first consisting of suspicious timing, ambiguous statement oral or written, and other bits and pieces from which an inference of discriminatory intent might be drawn." Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir.1994) .(citing Giacoletto v. Amaz Zinc Co., 954 F.2d 424 (7th Cir.1992); Holland v. Jefferson National Life Ins. Co., 883 F.2d 1307, 1314-15 (7th Cir.1989).[6] "Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment." Troupe, supra at 736. "And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." Id.
 
 
 59
 With respect to direct evidence of discrimination, plaintiff asserts, in his affidavit, that he had "heard, on a weekly basis, the Fort Wayne operations manager, Scott Turner, make racist comments." (Hunter Aff. p 8). This is insufficient to withstand the motion for summary judgment because there is no evidence that the person who allegedly made racists comments played any role in the decision not to hire him as a permanent employee or to terminate him as a temporary employee. "[B]efore seemingly stray remarks will qualify as direct evidence of discrimination, the plaintiff must show that the remarks 'were related to the employment decision in question." ' Fuka v. Thomson Consumer Electronics, 82 F.3d 1397, 1403 (7th Cir.1996)(quoting, McCarthy v. Kemper Life Ins. Co., 924 F.2d 683, 686-7 (7th Cir.1991)). "If such proof is lacking, the remarks alone will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker." Id.
 
 
 60
 Plaintiff also suggests as circumstantial direct evidence that Habegger checked his worker's compensation history. How this in any way establishes a claim for race or disability discrimination is unclear particularly when the report given to Habegger disclosed no worker's compensation record. Further, the record also discloses that plaintiff was not the only person whose history was checked--in fact, the person who replaced plaintiff in the position of truck driver underwent a similar background check.
 
 
 61
 Plaintiff also argues, without elaboration, that "[t]here is also the matter of other indirect evidence of di scrimination...[t]hree, the suspicious timing of the increased scrutiny of employment applications." What plaintiff means by this is unclear. His application was sent to DSI approximately two weeks after it was received and there is nothing suspicious about conducting a check after an application has been filed. Perhaps, though it is unclear, his complaint is that DSI was conducting the background checks and as such these checks were more rigorous than they had been before. While it may be true that plaintiff's application was among the first, if not the first, to run the DSI gauntlet, this does not establish discrimination or even suggest that discrimination played any part in the review of plaintiff's application. The record before the Court is clear that Habegger was undertaking an unprecedented expansion of its facilities. Plaintiff's application, though perhaps the first, would not be the only application that was forwarded to DSI.
 
 
 62
 Having failed to establish direct evidence of discrimination, the Court turns to the McDonnell Douglas paradigm. Under this burden shifting approach, plaintiff must initially establish a prima facie case of discrimination by showing "(1) application by plaintiff to fill a vacancy; (2) qualification; (3) rejection; and (4) continued efforts by the employer to seek applicants with plaintiff's qualifications." Cherry v. American Tel. & Tel. Co., 47 F.3d 225, 228 (7th Cir.1995); see also, Pilditch v. Board of Education of Chicago, 3 F.3d 113, 116 (7th Cir.1993).[7] "This guidance leaves room for adaption to different situations, for the model is not 'inflexible'." Cherry, supra at 228 (quoting Burdine supra at 253, n. 6, 101 S.Ct. at 1094, n. 6). To raise an inference of discrimination, the fundamental requirement is that plaintiff must show that as a black or disabled individual he was treated differently than a similarly situated white or non-disabled individual. Id; see also, Chambers v. American Trans Air, Inc., 17 F.3d 998, 1003-4 (7th Cir.1994).
 
 
 63
 If plaintiff is successful in establishing a prima facie case, a rebuttable presumption of discrimination is created and "the burden of production shifts to the defendant...to produce some legitimate nondiscriminatory reason for the challenged employment decision." Kirk, supra at 138. "If the defendant produces the legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered by the defendants were a pretext for discrimination." Id. "Of course, the ultimate burden of persuasion (not production) rests with the plaintiff at all times." Id.
 
 
 64
 Plaintiff cannot successfully navigate the shifting burdens under McDonnell Douglas because he cannot establish a prima facie case since he has not established that he was qualified for the position of truck driver with Habegger. While it may be true, as plaintiff asserts, that he was functioning well as an employee prior to the acquisition of the company by Habegger, this does not establish that he met the legitimate expectation of his employer that he be insurable under Habegger's liability and umbrella coverage.
 
 
 65
 Assuming that plaintiff had established a prima facie case, the burden of production would then shift to the defendant to produce some legitimate non-discriminatory reason for the challenged employment action. Kirk, supra at 138. Here, as in many employment discrimination cases, the second element of the prima facie case, qualification, and the issue of pretext focus on the same circumstances because the employer maintains that the employee was not qualified for the position applied for. Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir.1996). The issue then becomes whether that proffered reason is pretextual.
 
 
 66
 "There are two methods of showing pretext: 'Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." ' Wolf v. Buss (America) Inc., 77 F.3d 914, 919 (7th Cir.1996), cert. denied, 519 U.S. 866, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996)(quoting Sharsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir.1993)). Pretext does not require that the facts presented by the defendant as the reason for its employment action not be true, only that they not be the reason." Emmel, supra 95 F.3d at 634. "When a plausible reason was in fact not the reason, it is pretextual." Id. " 'Pretext...means a lie, specifically a phony reason for some action." Id. (quoting, Perdomo v. Browner, 67 F.3d 140, 144-45 (7th Cir.1995).
 
 
 67
 "[I]n order to survive a motion for summary judgment, an employee need only 'produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [its adverse employment decision]." ' Weisbrot v. Medical College of Wisconsin, 79 F.3d 677, 682 (7th Cir.1996) (quoting Courtney v. Biosound, Inc., 42 F.3d 414, 424 n. 4 (7th Cir.1994)). "[A] plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the [decision] in question, or were insufficient to motivate the [decision]." Testerman v. EDS Technical Products Corp., 98 F.3d 297, 301 (7th Cir.1996) (citing, Wolf, supra at 919).[8]
 
 
 68
 In the present matter, the undisputed evidence is that plaintiff was not insurable under Habegger's policies or at least defendant so believed. Plaintiff has produced no evidence from which a rational factfinder could infer that Habegger lied about its proffered reason for failing to hire plaintiff as a full-time employee.
 
 
 69
 "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Giannopoulos v. Brach & Brock Confections, Inc., Slip Op. 96-2230 p. 9 (7th Cir. March 26, 1997). In this case, then, the critical question is not whether plaintiff was insurable generally, or has been insured both before and after his stint with defendant and its predecessor. Rather, the question is whether Habegger genuinely believed that plaintiff could not be insured by its carriers or whether this rationale for his termination or non-hiring was merely a pretext for race or disability discrimination. Plaintiff points to nothing in the record which reasonably calls into question the honesty of Habegger's professed belief on this score.
 
 
 70
 With respect to plaintiff's claim under the ADA, one more matter needs to be addressed. In his memorandum in opposition to the motion for summary judgment, plaintiff claims that "[p]laintiff as a matter of law is entitled to partial summary judgment" because defendant improperly inquired into his worker's compensation history.
 
 
 71
 Generally, the ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). It also prohibits (save for some exceptions not relevant here) medical examinations and disability related inquiries. 42 U.S.C. p 12112(d)(4)(A). The EEOC has taken this to mean that "an employer may not inquire into an applicant's workers' compensation history before making a conditional offer of employment," (EEOC TECHNICAL ASSISTANCE MANUAL § 9.1), a proposition with which defendant does not disagree.
 
 
 72
 To say that defendant was wrong in inquiring into plaintiff's worker's compensation history, however, does not in this Court view mean, as plaintiff suggests, that he is entitled as a matter of law to the full spectrum of remedies including an injunction, reinstatement, back pay, front pay, attorney's fees and punitive damages. This is so because to prevail on anything other than a request for an injunction,[9] it would have to be shown that but for the wrongful inquiry plaintiff would have been retained (or hired) as an employee.
 
 
 73
 The parties have cited no cases which directly address the issue of whether an individual who is otherwise not qualified may maintain a claim for violation of the ADA's standard regarding medical inquiries during the job application process. Both the statute and the EEOC regulations suggest that an individual must be otherwise qualified in order to prevail on such a claim.
 
 
 74
 Section 12112(d)(2)(A) of the ADA states that "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." Subsection (a) in turn provides that "[n] o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees...." 42 U.S.C. § 12112(a). Since statutory subsections pari materia must be construed with reference to each other, it seems clear that in order to assert that one has been discriminated against because of an improper medical inquiry, that person must also have been otherwise qualified. The EEOC appears to take a similar view for in its discussion of what an employer may do in regard to workers' compensation history, the EEOC indicates that "[a] worker also must be 'qualified' (with or without a reasonable accommodation) to be protected by the ADA."
 
 
 75
 Recently, in Armstrong v. Turner Industries, Ltd., 950 F.Supp. 162 (M.D.La.1996), the court was presented with the issue of whether an individual who does not meet any of the definitions of disability may maintain a claim for violation of the ADA's medical inquiries prohibition. After reviewing the statute and its legislative history, the court wrote:
 
 
 76
 ...[T]he prohibition against discrimination against preemployment inquiries specifically refers back to the general prohibition against discrimination against qualified individuals with disabilities. Throughout the next paragraph, which is § 12112(b), the statute further defines the types of discrimination prohibited and continues to refer to job applicants or employees who are otherwise qualified individuals with disabilities.
 
 
 77
 There is also nothing in the legislative history which supports the conclusion that Congress intended any job applicant to have a cause of action for violation of the ADA rules on preemployment examinations and inquiries. A review of the legislative history shows that the section on medical examinations and inquiries was included to parallel the same requirements and regulation under the Rehabilitation Act of 1973, and designed to prevent employers from using preemployment information obtained from exams and interviews to exclude applicants with disabilities, particularly persons with 'hidden' disabilities.... Again, the legislative history indicates that the preemployment provisions exist to protect qualified individuals with disabilities--those who are disabled within the meaning of the ADA--not job applicants who do not meet any of the definitions of disability in § 12102(2).
 
 
 78
 Id. at p. 167 Internal citations omitted).
 
 
 79
 Here, while it can be assumed that plaintiff was disabled within the meaning of the ADA, it can not be assumed that he was qualified for the position. To the contrary, the record shows just the opposite--he was not hired or retained because Habegger was of the belief that he was uninsurable under its policies. Moreover, the inquiry into plaintiff's worker's compensation history was negative. It is illogical to assume that an individual was not hired because of an improper inquiry where the inquiry did not disclose anything adverse to the individual.
 
 D. Retaliation Claim
 
 80
 As the parties to this suit recognize, to establish a claim of retaliation, the general McDonnell Douglas framework as set forth above is applicable except that the prima facie elements are slightly altered. See, Rennie v. Dalton, 3 F.3d 1100, 1108 (7th Cir.1993). "In order to establish the prima facie case of retaliation under McDonnell Douglas ...a plaintiff must show: (1) []he engaged in statutorily protected expression; (2) []he suffered an adverse action by h[is] employer; and (3) there was a causal connection between the protected expression and the adverse action." Alexander v. Gerhardt Enterprises, Inc., 40 F.3d 187, 195 (7th Cir.1994)(internal citation omitted).
 
 
 81
 In the present matter, plaintiff asserts that "[o]ne way of showing this connection [between the protected expression and the adverse action] is for the events to be close in time. Or, as one court has eloquently stated, a 'telling temporal sequence' existing." (Rec. 30, p. 8 citing Alexander supra at 196). The sum and substance of plaintiff's argument on his retaliation claim is that because he engaged in protected activity by filing charges with the EEOC and he was discharged less than one month later there was a connection between the two.
 
 
 82
 While it is true that proximity in time between the filing of a charge and an adverse employment action may be some evidence of retaliation, see, Shirley v. Chrysler First, Inc., 970 F.2d 39, 42-43 (5th Cir.1992), it does not follow perforce that the adverse employment action was causally related to the protected activity. As was explained by Chief Judge Posner:
 
 
 83
 [C]ommonsensically enough, ...the timing of a discharge or other adverse personnel action in relation to the employee's act that invited retaliation can be circumstantial evidence of retaliation. But there is a difference, important although subtle, between treating a 'close sequence of events' (and it must be close, cf., Tobey v. Extel/JWP, Inc., 985 F.2d 330 (7th Cir.1993)) as circumstantial evidence of retaliation and suggesting that it gives rise to an inference of retaliation. That suggestion is a garbled, and really quite nonsensical, version of Hume's theory of causation--that when one event (B) has in the past always followed another (A) in swift succession, the human mind develops a fixed expectation that whenever A is observed, B will occur, and that this expectation is all we mean by calling one thing the 'cause' of another. This is a far cry from saying that an inference of causation may rationally be drawn whenever two events occur in close sequence. That would mean that if [plaintiff] was fired at 4:30 p.m. and the sun set at 4:40, an inference would arise that this firing caused the sun to set.
 
 
 84
 Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1225 (7th Cir.1995).
 
 
 85
 Here, plaintiff has offered nothing other than the fact that he was discharged shortly after his charge to the EEOC to support his claim that his discharge was in retaliation for his claim. Though that may aid in supporting a prima facie case, it does nothing to rebut defendant's evidence, as set forth previously, that there was a legitimate, nondiscriminatory reason for his being let go--his uninsurability. Accordingly, summary judgment is appropriate on this claim as well.
 
 Conclusion
 
 86
 On the basis of the foregoing, the Motion for Summary Judgment filed by the defendant Habegger Corporation-on January 27, 1997 is GRANTED.
 
 
 
 [1]
 Because defendant Habegger agreed with the EEOC to no longer inquire into the workers' compensation history of prospective employees, plaintiff's request for an injunction is moot
 
 
 [1]
 That business entity is now known as Bryant Habegger Company Fort Wayne
 
 
 [2]
 The temporary employees were obtained through temp agencies such as Interim Personnel. Habegger paid Interim for the services of such employees which in turn paid the temporary employees. Under the agreement between these parties, Habegger could turn a temporary employee into a permanent employee without paying any fee to Interim if the employee had worked a certain number of predetermined (here 320) hours
 
 
 [3]
 Plaintiff asserts that he had previously submitted an application for regular employment some two months earlier
 
 
 [4]
 Plaintiff was terminated on November 14, 1995. Prior to his termination, plaintiff had filed charges of discrimination with the EEOC against Habegger (or its predecessor) and/or Interim Personnel on October 5 and 15, 1995
 
 
 [5]
 Where, however, a plaintiff complains that the defendant discriminated by not making a reasonable accommodation under 42 U.S.C. § 12112(b)(5)(A)-(B), use of the McDonnell Douglas paradigm is "unnecessary and inappropriate." Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1284 (7th Cir.1996). Here, plaintiff's complaint under the ADA is one of disparate treatment and there is no suggestion that defendant did not make a reasonable accommodation
 
 
 [6]
 "This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words written or oral." Troupe, supra at 736
 
 
 [7]
 "The prima facie case [of disparate treatment under the ADA] requires a plaintiff to prove that (1) he is a member of a protected class; (2) his work performance met the employer's legitimate job expectations; [and] (3) his employment was terminated...." DeLuca, supra at 797
 
 
 [8]
 "These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for [an adverse decision] is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation: 'If the only reason an employer offers... is a lie the inference that the real reason was a forbidden one... may rationally be drawn." ' Id. (quoting Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir.1990)
 
 
 [9]
 Plaintiff's request for injunctive relief is moot because, as noted by plaintiff, defendant has entered into a conciliation agreement with the EEOC by which it agreed to no longer inquire into its prospective employee's worker's compensation history