**NORWEST BANK, N.A., Plaintiff,**

v.

**FEDERAL KEMPER LIFE INSURANCE COMPANY, Defendant.**

**No. 1:99–CV–386.**

United States District Court, N.D. Indiana, Fort Wayne Division.

July 26, 2000.

Leonard Eilbacher, Eilbacher Scott Inc, Fort Wayne, IN, for Leonard Eilbacher, mediator.

Daniel G McNamara, Rothberg and Logan, Fort Wayne, IN, for Norwest Bank of Indiana NA, plaintiff.

Michael L James, Frederick B Jonassen, Baker and Daniels, Fort Wayne, IN, for Federal Kemper Life Assurance Company, defendant.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on a Motion for Summary Judgment filed by the defendant Federal Kemper on April 19, 2000. Plaintiff Norwest Bank respond-

ed to that motion on May 19, 2000 to which defendant filed a reply on May 30, 2000.

Also before the Court is "Defendant's Motion to Strike Portions of Plaintiff's Response and Affidavits Relevant to Promissory Estoppel" filed May 30, 2000 as well as a "Motion for Leave to File Amended Complaint" filed June 2, 2000. Those motions too have been fully briefed.

For the following reasons, defendant's motion for summary judgment will be granted. Defendant's motion to strike will be granted and plaintiff's motion to file an amended complaint will be denied.

### Factual Background

Plaintiff brought this breach of contract action against the defendant alleging that the defendant had wrongfully terminated a life insurance policy which had been assigned to plaintiff without giving plaintiff required notices of premiums due or policy lapse. Defendant has taken the position that it had no duty to provide such notices and that, in any event, it did in fact provide notices. The facts underlying the dispute are essentially the following.

In 1988, Federal Kemper issued a life insurance policy to Richard S. Russell. The policy, which had coverage in the amount of $400,000, was for a term of twenty-eight years, beginning in July 1988 and ending in July 2016. Premium payments were to be made on a semi-annual basis—one payment due on January 26 and the other due on July 26 of any given year.

On January 9, 1990, Russell assigned the policy in favor of Angola State Bank as collateral security for a loan.[1] A couple of weeks later, on January 24, 1990, Federal Kemper acknowledged the collateral assignment and informed Angola State Bank that the assignee would be notified upon expiration of the grace period should the premium not be paid.

---

1. According to Norwest, the assignment was to secure two loans. Russell went into default on the loans in August 1991 at a time when he owed $893,125.35, including principle and interest.

On September 1, 1992, Federal Kemper sent a letter to Angola State Bank indicating that the Russell policy had lapsed due to default in the premium payment for July 26, 1992. The premium was then paid by Norwest Bank and by letter dated November 22, 1993, Norwest informed Federal Kemper that Angola State Bank had merged with Norwest and accordingly "the Bank name on the policy should be changed to Norwest Bank Angola, P.O. Box 120, Angola, IN 46703." That letter also requested "that the Premium Notice be sent to Norwest Bank Angola as the Bank is paying the premium." Norwest made the premium payments for the Russell policy that were due in January of 1992, July of 1992, January of 1993, and July of 1993.[2]

Federal Kemper claims that on December 29, 1993 it sent the first billing notice for the premium due on January 26, 1994. The notice was addressed to Richard Russell, FBO Richard Russell, PO Box 120, Angola IN 46703. Federal Kemper also claims that a second billing notice for the January 26 payment was sent to the same address as the first notice on February 15, 1994 and a third notice was sent on February 28, 1995.

Norwest claims that it did not receive any of those three notices—none are contained in its files for the Russell loan as would be the normal practice. Norwest also claims that while it was Federal Kemper's usual practice to send notification of a lapse to the general agent—here, Broker's Clearinghouse—that entity also did not have notice of the lapse.

Federal Kemper also contends that in a letter dated March 3, 1994, Norwest Bank was informed that the policy had lapsed. Again, Norwest claims that it did not receive that letter in the normal course of events but only became aware of the letter when it was sent as an enclosure to a

letter signed by Rita Lovelace of Federal Kemper dated October 28, 1996.

On August 25, 1995, Norwest Bank sent Federal Kemper a letter in which it noted that it recently had been informed verbally that the Russell policy had lapsed due to non-payment of the premiums. The letter further requested that the policy be reinstated and pointed out that the bank had asked Federal Kemper previously to send the statements to it and had informed Federal Kemper that the bank was paying the premium. The letter also noted that it had previously paid the insurance premiums and that it was not notified in writing of the policy lapse and cancellation.

Russell died on August 25, 1997. According to Norwest, the outstanding balance on his loans exceeded $400,000—the value of the life insurance policy issued by Federal Kemper.

### Application of Law

As indicated defendant Federal Kemper has moved for summary judgment. Prior to reaching that motion, however, the Court must consider plaintiff's Motion to Amend the Complaint and defendant's Motion to Strike. Those matters will be analyzed in turn after a review of the standards governing summary judgment.

### Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must

---

2. Premium notices, and notices of lapses in the premium around this time indicated that the servicing agent was Barbara Hoefer Crowley of Broker's Clearing House in Des Moines, Iowa.

be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

▆▆▆ Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202.

***Motion to Amend and Motion to Strike***

▆▆▆ Plaintiff has moved to amend its complaint to add a claim of promissory estoppel. Defendant opposes that motion and further has filed a motion to strike portions of plaintiff's brief in response to the motion for summary judgment and

portions of the affidavits submitted in support thereof since the same are, in its view, untimely. This Court agrees.

Norwest filed its complaint in the Steuben Circuit Court on August 26, 1999, alleging only a breach of contract. Federal Kemper removed the action to this Court on September 15, 1999. Under the Report of the Parties' Planning Meeting, Norwest was allowed until January 15, 2000 to amend its complaint and discovery was to be completed by March 1, 2000.[3] On April 19, 2000, Federal Kemper filed its motion for summary judgment to which Norwest filed its response on May 19, 2000 including arguments relating to a claim for promissory estoppel.

▆▆▆ Under Indiana law,[4] "a promissory estoppel claim has five elements: (1) a promise by the promisor [here, Federal Kemper], (2) made with the expectation that the promisee [here, Norwest] will rely thereon, (3) that induces reasonable reliance by the promisee, (4) of a definite and substantial nature, and (5) injustice can be avoided only by enforcement of the promise." *United of Omaha v. Hieber,* 698 N.E.2d 869, 876 (Ind.App.1998) (citing, *Lightle v. Harcourt Mgmnt. Co.,* 634 N.E.2d 858, 860 (Ind.App.1994) *trans. denied*). "When estoppel is relied upon as an element of a cause of action, it must be pleaded with particularity, with every essential fact set forth, since nothing can be supplied by inference or intendment." *Holloway v. Giganti, Inc.,* 540 N.E.2d 97, 100 (Ind.App.1989). Thus, a claim of promissory estoppel must be pled with particularity. *See, NIPSCO v. Dabagia,* 721 N.E.2d 294, 299 (Ind.App.1999); *Bee Window, Inc. v. Turman,* 716 N.E.2d 498, 501 (Ind.App.1999).

In the present matter, Norwest did not plead a claim of promissory estoppel in its complaint—particularly or otherwise. Instead, it addressed the claim in its response brief and, apparently recognizing

---

**3.** The parties thereafter agreed to extend discovery until March 15, 2000.

**4.** The parties agree that Indiana law provides the substantive law in this diversity case.

the omission after it was raised in Federal Kemper's motion to strike, filed a motion for leave to amend its complaint on June 2, 2000. That is too late in the proceedings particularly since Norwest has failed to adequately explain its delay in seeking leave to amend.

■ " 'A plaintiff may not amend [its] complaint through arguments in [its] brief in opposition to a motion for summary judgment.' " *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir.1997) (quoting, *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996). Indeed, in *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997), the Seventh Circuit held that where plaintiff "did not include the promissory estoppel claim in his complaint or his amended complaint, adding it only at the summary judgment stage[,] [t]his is too late in the day to be adding new claims." The rationale for such holdings has been explained by the Seventh Circuit in the following manner:

> Seeking to amend one's complaint when it appears that the current one is a sure loser is not unusual; nor is the denial of leave to file an amended complaint. Our recent decision in *Sanders*, 56 F.3d at 773 (citations omitted), recites the litany of instances in which we affirmed a district court's denial of leave to amend a complaint where discovery has ended and a motion is pending for dismissal of a count or for summary judgment. A denial is particularly warranted in instances which the plaintiff has failed to provide an explanation as to why the amendment did not take place sooner, and where the delay in granting the motion to amend would cause delay and burden the parties.... [Plaintiffs] are advised to take note of our admonition in *Sanders*, 56 F.3d at 775 (quoting William Shakespeare, Twelfth Night, II 42.), 'In delays there lies no plenty.' *Hindo v. University of Health Sciences*, 65 F.3d 608, 614 (7th Cir.1995).

Quite apart from the fact that a party cannot amend its complaint through arguments in its brief, Rule 16(b) of the Federal Rules of Civil Procedure provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the ... judge." See generally, BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURT § 27.3(D) (Robert L. Haig ed.) (West Group & ABA 1998). This derives from the court's "[c]ase-management authority ... to shepherd cases towards fair, yet efficient, resolution ..." and hence "litigants have an unflagging duty to comply with clearly communicated case-management orders." ... *Rosario–Diaz v. Gonzalez*, 140 F.3d 312, 316 (1st Cir.1998).

In the present matter, Norwest first sought to amend its complaint to add a promissory estoppel claim eight months after it filed its original complaint, more than four and a half months after the deadline to amend had passed, more than two and a half months after discovery had closed, and more than a month and a half after the motion for summary judgment had been filed. However, Norwest has wholly failed to adequately explain its delay.

In its brief in support of its motion to amend its complaint, Norwest indicates that its counsel's computer records show that the motion, memorandum in support thereof, and amended complaint were completed by May 1, 2000 and that it intended to file the same at that time but did not do so due to some "unknown clerical error." Even so, that date, May 1, 2000, was still long after discovery had closed and after the time that Federal Kemper had filed its motion for summary judgment.

Norwest also claims that Federal Kemper will in no way be prejudiced because, after all, Norwest had essentially put defendant on notice of its promissory estoppel claim by providing the document containing the alleged promise on October 24, 1999 and by certain answers to interrogatories served on February 7, 2000. That argument, however, works as much against

Norwest as it does Federal Kemper. If, as Norwest contends, it placed defendants on notice through these discovery responses and/or requests, then Norwest most assuredly could have moved to amend its pleadings before the close of discovery and before defendant filed its motion for summary judgment.

Norwest also contends that defendant has not been prejudiced since, upon receipt of the discovery matters in October 1999 and February 2000, Federal Kemper could have conducted discovery on such a claim prior to the close of discovery on March 15, 2000. What Norwest does not make clear, however, is why a party would undertake to conduct discovery on a claim which has not been made a part of the lawsuit.

Finally, Norwest claims that Federal Kemper cannot be prejudiced because Federal Kemper argued against a promissory estoppel claim in its memorandum in support of its motion for summary judgment. Leaving aside that Norwest has yet to adequately explain its delay in filing its motion to amend, this Court does not find the fact that defendant discussed promissory estoppel in its brief a particularly compelling argument.

Federal Kemper does discuss promissory estoppel in its brief, albeit in a somewhat general fashion. It did so, however, only after pointing out that Norwest had not pled such a claim and that the time to amend the complaint had long since passed. The discovery which was tendered to Federal Kemper which supposedly put it on notice of a promissory estoppel claim related to Federal Kemper's letter of January 24, 1990, which purportedly contained a promise that it would provide Norwest with notice of a lapse in the policy. However, as defendant points out, and has been previously indicated, promissory estoppel in Indiana consists of five elements, only one of which is that there existed a promise. Without discovery on the matter, it would appear that defendant would not know the basis for the other

elements of the claim or whether Norwest even thought it had a sufficient basis to make out the other elements of the claim. It could very well be, as Federal Kemper argues, that through discovery it "could have explored the novel assertion that Norwest would not have approved making premium payments on the Russell policy were it not for the alleged promise contained in the letter of January 24, 1990." That aside, it seems clear that defendant would have been entitled to additional discovery to ferret out the basis of the promissory estoppel claim, something which Federal Kemper would be denied were this Court inclined to grant the motion to amend and proceed to rule on the pending motion for summary judgment.

Absent a sufficient explanation for failing to move to amend a complaint which by plaintiff's own account should have been reasonably foreseeable to the defendant, this Court is not inclined to grant the request. Such a move presumably would lead to a motion to reopen discovery and a potential continuation of the trial date.

The motion to amend the complaint will be denied. The motion to strike the arguments relating to a promissory estoppel claim and the evidence in support thereof will be granted.

### Breach of Contract

The upshot of Norwest's complaint is that Federal Kemper breached its contractual duty to Norwest by failing to deliver timely premium notices to Norwest and by failing to notify Norwest that the Russell policy had lapsed. For its part, Federal Kemper asserts that it owed no duty to Norwest to provide it with notice and that, in any event, Norwest's attempt to rectify the nonpayment on the policy came far too long after the policy had lapsed.

Preliminary, this Court will briefly address the parties' arguments relating to the assignment of the policy and what impact that had on the right of Norwest to receive notice. As will be seen, however,

this Court does not find that issue to be dispositive.

 "An insurance policy is a type of property which may be assigned as collateral." *Matter of Estate of Devine,* 628 N.E.2d 1227, 1229 (Ind.App.1994). "The general rule is that '[i]n the absence of any statute or contract of the insurer to the contrary or conduct of the insurer giving rise to a duty to notify the assignee, there is no duty on the insurer to notify an assignee of the policy of premiums or assessment due thereon.'" *First United Life Ins. Co. v. Northern Indiana Bank,* 444 N.E.2d 1241, 1245 (Ind.App.1983) (citation omitted). "On the other hand where the assignment is absolute and unqualified in *fact* so that the entire beneficial interest in the policy vests in the assignee and it is the assignee's obligation to make payments necessary to preserve the policy, then at least where the insurer has consented to the assignment, required notices should be given to the assignee." *Id.* (emphasis in original).

Here, plaintiff has pointed to no statute which would require Federal Kemper to send premium and lapse notices to Norwest. Nor does Norwest allege in its complaint that Federal Kemper engaged in conduct which gave rise to a duty to send premium and lapse notices. Norwest does, however, allege that Federal Kemper had a contractual duty to send such notices.

The policy issued to Russell contained a box, number 17 on the application, which read:

17. Bill Form: ☐ List Monthly ☐ P.A.C. Monthly

Direct: ☐ Annual ☐ Semi-annual ☐ Quarterly

All billing notices are to be sent to (check one:

☐ Owner

☐ Other (give address): _____

_____

_____

Planned Periodic Payment $ _____

In response to those queries, Russell checked the boxes marked "annual" and "owner." Norwest contends that this meant that under the terms of the policy, Russell was entitled to notice of premiums due and any lapses and that, upon assignment, Norwest then was entitled to the same.

For its part, Federal Kemper claims that box 17 did not require that Russell be sent any such notices. It argues:

Box 17 of the application does not create any obligation for Federal Kemper to send premium or lapse notices to Richard Russell. The Box states, "All billing notices are to be sent to (check one)" and provides the applicant with a choice of boxes for "Owner" or "Other (give address)." "Owner" is checked. In Box 17, Federal Kemper does not undertake to send billing notices to anyone. This is simply a choice for the Owner, Russell. Furthermore, there is no agreement concerning how many notices would be sent or when they should be sent. When asked by Federal Kemper sent notices to Mr. Russell, Renee Dwyer, Federal Kemper's Rule 30(b)(1) witness, stated, "We'd like to collect a premium on there.... Dwyer added that the notices were a "[f]riendly reminder." ... From this evidence, the most one can say is that Federal Kemper did not send notices to fulfill any contractual obligations, but rather to remind whoever the owner of the policy

designated to make timely premium payments".

(Rec.18, p. 9).

In this Court's view, Federal Kemper reads the record rather stringently particularly since, on this summary judgment motion, all inferences from the record are to be construed in plaintiff's favor. Certainly a fair inference which could be drawn from the inclusion of Box 17 in the application is that the owner (or whoever was designated) would receive notices—"billing notices" could easily be read to mean premium notices. *Cf. Clarin Corp. v. Massachusetts General Life Ins. Co.*, 44 F.3d 471, 477 (7th Cir.1994) (under Illinois law, checking the "owner" box in answer to question where premium notices should be sent could be read as meaning "notice" under the Illinois Code which requires that notice of premium be sent in a given time frame and indicating that failure to pay when due makes policy forfeited and void or it could mean "premium notices, unadorned with warnings or specific time requirement").

That Russell may have been entitled to notice, however, does not perforce mean that Norwest would be entitled to the same. After all, the application referred to the owner—in this case Russell—and Norwest was not the "owner" but the "assignee." Since the assignment was as collateral for a loan, Federal Kemper argues that it had no duty to inform the assignee regarding premiums due or a lapse of coverage.

It is true that the document was titled "ASSIGNMENT OF POLICY AS COLLATERAL SECURITY." That the assignment had the magic term "collateral" in its title is not determinative in this Court's view, however.

5. In a somewhat analogous situation, the California Court of Appeals wrote that "if the insurer had meant to exclude from the scope of the assignment the right to receive delinquent premium notices, notices of intended

The document, which was prepared by Federal Kemper is quite broad in nature and nothing in it would appear to limit any duties which might be imposed under the policy regarding notice. To the contrary, Federal Kemper appears to have assumed that the assignment entitled the assignee to some notice for in a letter dated January 24, 1990 Federal Kemper wrote to Norwest:

Dear Gentlemen:

Enclosed is a copy of the acknowledged collateral assignment for your records. The premiums have been paid to July 26, 1990.

The assignee will be notified upon expiration of the grace period should the premium not be paid.

If we can be of further assistance, please let us know.

Sincerely

/s/ _____

JOCELYN WILHELM, Service Representative

(Rec. 22, Tab B).

True, that letter is not a part of the assignment (and probably in any event would be of more aid in support of a promissory estoppel claim) but the Indiana Court of Appeals in *First United*, 444 N.E.2d at 1245 indicated that a court could "go behind the language of the assignment in determining the bank's interest." Moreover, the assignment is broad, transferring Russell's "rights, title and interest" in the policy save for a few restrictions, none of which related to the right to receive notice of premiums due. Although the document is styled an assignment as collateral security, this does not mean that the Court should simply ignore the language contained in the document. The document was, after all, prepared by Federal Kemper and if it wanted to exclude notices, it easily could have done so.[5]

lapse, or offers of reinstatement, it should have unambiguously set forth such excepted rights in Paragraph C, so as to qualify the otherwise ambiguous and unconditional assignment of the policy rights and privileges

In this Court's view, this conclusion is in keeping with the language previously quoted from *First United Life*, 444 N.E.2d at 1245 that "where the assignment is absolute and unqualified in *fact* so that the entire beneficial interest in the policy vests in the assignee and it is the assignee's obligation to make payments necessary to preserve the policy, then at least where the insurer has consented to the assignment, required notices should be given to the assignee." Hence, summary judgment will not be granted on this basis.

■ Summary judgment will, however, be granted on the basis that Norwest waited too long in seeking to have the policy reinstated after the January 26, 1994 premium payment was not made. Federal Kemper claims that Norwest's claim is barred as a matter of law because Norwest took 17 months to contact Federal Kemper after the January 1994 payment was missed. For its part, Norwest asserts that a reasonable trier of fact could conclude that only fifteen months elapsed because it contacted Broker's Clearinghouse in April of 1995 and a dispute exists as to whether Brokers was an agent of Federal Kemper.

Even if the fifteen month period is used as plaintiff suggests, this Court is of the view that is too long. By delaying for that period, it means that three premium payments (that for January 1994, July 1995 and January 1995) had been missed before it contacted Broker's Clearinghouse and another one (July 1995) was missed before Federal Kemper was asked by Norwest to reinstate the policy.

An old case in Indiana—apparently the only one on point and the only one cited by the parties—supports this conclusion. In *Western Life Indemnity Co. v. Bartlett*, 84 Ind.App. 589, 145 N.E. 786 (1924), an insurance company had for eight years given

made pursuant to paragraph A of the assignment." *Estate of Coate v. Life Ins. Co. of Calif.*, 98 Cal.App.3d 982, 159 Cal.Rptr. 794, 797 (1979).

**6.** The Indiana Court of Appeals in *Western Life* cited with approval the decision in *Grant*

notice approximately fifteen days in advance of when monthly premiums were due but failed to give any notice of the premium due January 1, 1922. Although the court recognized that there was a custom that the insurance company would send notice, when it did not do so and the insured failed to pay within a reasonable time (within 30 days of the grace period), this did not excuse the insured from her duty to act since "ordinary prudence most certainly required her to take notice of . . . failure [to receive] notice and to hasten to ascertain why the notice had failed to arrive at the proper time." *Id.* at 798. The court wrote:

> . . . And when the insured seeks to be relieved from a forfeiture for nonpayment of premiums, on the ground of failure to give the customary notice, he must bestir himself and pay or offer to pay within a reasonable time. A failure to act within a reasonable time, without some providential cause, out to conclude him . . . .

> \* \* \* \* \* \*

> Where an insured, with knowledge possessed by appellee, allows six weeks to pass by after failing to receive the customary monthly notice, and also allows the time for paying two premiums to pass without any excuse for doing so, other than that he had theretofore waited until the receipt of notice, should not be sufficient to relieve him from the failure to pay within time, when there is no claim that he did not know the amount of premiums and when they were due and payable. Such a failure can result only from negligence.

*Id.*[6]

Norwest seeks to distinguish *Western Life* on the grounds that "it deals with

v. *Alabama Gold Life Insurance Co.*, 76 Ga. 575 (Ga.1886) wherein the Georgia Supreme Court wrote:

> . . . Yet the insured must act with reasonable diligence, and six months' delay to pay a premium for want of notice appears to us

what is reasonable conduct for an insured, not an assignee which is a financial institution which monitors hundreds of loans at any one time" and because "it deals with situations where the insurer has failed to provide customary notices, not where the right to notice was created either by the terms of the underlying insurance policy or by the express promise from the insurance company to an assignee of a policy." (Rec.22, p. 21). This Court does not find those distinctions compelling.

Merely because the bank was an assignee rather than the owner of the policy does not change the analysis. This is because, as a general proposition, an assignee has no greater rights than an assignor. *See, Plumlee v. Monroe Guaranty Ins. Co.,* 655 N.E.2d 350, 357 (Ind.App.1995); *Carrier Agency, Inc. v. Top Quality Building Products, Inc.,* 519 N.E.2d 739, 741 (Ind. App.1988).

Nor is the Court inclined to grant Norwest some special dispensation merely because it is, after all, a financial institution which is not in the business of paying premiums on life insurance policies. Certainly an institution which manages money and hires professionals to monitor files like the one in this case, armed with computers capable of tracking payments, should be accorded no more deference than an individual who fails to pay premiums.

As for Norwest's contention that *Western Life* is different because that case was based on custom as opposed to promissory estoppel, this Court finds that to be a distinction without a difference—even leaving aside the fact that a promissory estoppel claim was not timely pled. An obligation which arises from custom is like that arising from a promise in that both are based on conduct which induces reliance. *See, Weinig v. Weinig,* 674 N.E.2d 991, 996 (Ind.App.1996) (citations omitted) (" '[E]stoppel is a concept grounded in fairness, and a claim of estoppel may properly be considered whenever a party is alleged to have actively participated in the creation of a misperception of fact or mistaken belief of which it then seeks to take unfair advantage.' ... [T]he issue is whether [defendant's] statements created the sort of reliance that equity will enforce by estoppel.").

A more recent case cited by the defendant, *Bezanson v. Metropolitan Insurance and Annuity Co.,* 952 F.2d 1 (1st Cir. 1991), further supports the conclusion that plaintiff waited to long to make payments in this case and further counters plaintiff's argument that the delay is excusable because the policy required notice of lapse. There, the trustee in a corporate bankruptcy brought an action on the life insurance policy of the president of the corporation. The policy had lapsed due to default on the semi-annual payments even though the insurance company had sent notice of a 61 day grace period (as required by the policy) to the corporation. The trustee did not receive notice and the policy was terminated. Thereafter, the insured died whereupon the insurer rejected the trustee's claim for the policy proceeds. The trial court ruled that a copy of the lapse notice should have been provided to the trustee and since it was not, that had the effect of extending the grace period indefinitely. The United States Court of Appeals for the First Circuit reversed writing:

> ... [W]e are aware of no law anywhere supporting the position that failure to send a required notice of lapse will extend the policy indefinitely. It would be

so unreasonable as to show a purpose to abandon the policy and let it lapse; and if a jury should decide that such was reasonable, the court should not permit the verdict to stand. Two or three months in a policy of annual premiums, a month or six weeks in semiannual premiums, is time enough for one who has his life insured, though notice does not come to him from the company according to usage, to bestir himself to ascertain why the notice has not come, and not to do so within such reasonable time, without some overpowering providential cause, out to conclude him. *Id.*

a harsh, and most unreasonable rule. A grace period, continuing the coverage free, here 61 days, results in a selection against the company that it has accepted. The policy owner can wait, without obligation, and decide, retroactively, during that period to, or not to, continue the insurance, depending on what develops. It is appropriate that there should be a further, penalty period for failure to give the owner the promised alert, but surely it would be extraordinary to say that he gets a free ride and retroactive choice forever; there must be a limit of reasonableness.

*Id.*

Norwest's failure to offer to pay for some fifteen to seventeen months after the lapse which equated to either three or four missed premium payments does not constitute reasonable diligence as a matter of law. *Western Life*, the Indiana case, suggest that a reasonable period would be up to the time that the second payment becomes due—here six months. *Grant*, the Georgia case, would provide for a period of up to six weeks. And, *Benzanson*, the First Circuit case, would allow for payment within three times the grace period—in this case approximately three months. None of those case comes close to allowing payment anywhere near as belatedly as was attempted in this case.

True, in the sole case relied upon by Norwest, the Minnesota Supreme Court in *Northwestern Bank of Commerce v. Employers' Life Ins. Co. of America*, 281 N.W.2d 164 (Minn.1979), found that the insurance company defendant was liable to the assignee bank on a theory of promissory estoppel three years after a default in payment and lapse.[7] Again leaving aside the fact that promissory estoppel was not pled here, the critical distinction between *Northwestern* and this case is that in the former, the assignor apparently was paying the premiums and not the bank. As such, the only way for the bank to know whether the premiums were not paid was if it received notice to that effect from the insurance company. Here, to the contrary, the whole essence of Norwest's claim is that it assumed responsibility for making payments on the policy—indeed it informed Federal Kemper that it was making the payments in November 1993. If the premiums were not being paid Norwest was in the best position to know, not Russell the titular owner of the policy.[8]

At first blush this Court's conclusion may seem harsh since it seems to favor the insurance company—usually not the most sympathetically viewed entities. Nevertheless, it has been applied—even against individual insureds (as opposed to a bank) for strong policy reasons including that the insurance company would be paying for the premium payor's negligence in not timely making payments; the insurer would be paying for dishonest payors who might hold off paying until a loss occurs; and the insurance company would never know how much reserves to set up against apparently lapsed policies. *See, Western Life*, 145 N.E. at 789; *Bezanson*, 952 F.2d at 6.

### Conclusion

On the basis of the foregoing, the Motion for Summary Judgment filed by the defendant Federal Kemper on April 19,

---

7. Briefly the facts in that case were that the defendant insurance company had promised the assignee bank that in the event of a premium default, the insurance company would notify the assignee bank in ample time for it to protect its collateral. In October 1972, the insurance company told the bank that the policy was still assigned to the bank when in fact the policy had lapsed for a default in the payment of premiums. The bank only learned of the lapse after the insured had died and the bank demanded payment from the defendant under the policy.

8. Insofar as *Northwestern* and *Bezanson* may be viewed as being at loggerheads regarding how long a policy may remain in force even though no payments have been made (which they probably are not given the factual differences of the cases), this Court views as most reasonable *Bezanson's* reasonableness inquiry.

2000 is GRANTED. "Defendant's Motion to Strike Portions of Plaintiff's Response and Affidavits Relevant to Promissory Estoppel" filed May 30, 2000 is GRANTED. The "Motion for Leave to File Amended Complaint" filed June 2, 2000 by plaintiff Norwest is DENIED.